625 A.2d 1167

COMMONWEALTH of Pennsylvania, Appellee,

v.

Ian N. KARKARIA, Appellant.

Supreme Court of Pennsylvania.

Argued Sept. 25, 1992.

Decided May 26, 1993.

Martin W. Sheerer, Shuchert Sheerer, P.C., Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Claire C. Capristo, Deputy Dist. Atty., Michael W. Streily, Asst. Dist. Atty., Pittsburgh, for appellee.

Before NIX, C.J., FLAHERTY, ZAPPALA, PAPADAKOS, and CAPPY, JJ.

## OPINION OF THE COURT

CAPPY, Justice.

Appellant asserts that the evidence adduced at his trial was insufficient as a matter of law to sustain his conviction of forcible rape. Our review of the record compels the conclusion that appellant is correct and that his conviction must be reversed.

Appellant, Ian Karkaria, was charged with forcible rape, at 18 Pa.C.S. § 3121(1), pursuant to a private criminal complaint. The complaint alleged that appellant committed the crime of rape upon his stepsister on various dates between April 9, 1984 and September 19, 1984.[1]  The Allegheny County District Attorney initially declined to prosecute the matter on February 20, 1987, with the following notation appearing on the original complaint: "no mental deficiency; cannot prove force/or forcible compulsion." However, on March 2, 1987, the Administrative Judge of the Criminal Division of the Allegheny County Court of Common Pleas approved the complaint for prosecution. *See* Pa.R.Crim.P. 133(b)(2). Subsequently, on September 28, 1987, the matter proceeded to trial before a jury.

The jury returned a verdict of guilty. Post-trial motions were denied and appellant was sentenced to a mandatory term of imprisonment of not less than five (5) nor more than ten (10) years pursuant to 42 Pa.C.S. § 9718. The Superior Court affirmed the judgment of sentence. 406 Pa.Super. 662, 583 A.2d 833. This Court granted the Petition for Allowance of Appeal.

The Commonwealth's case-in-chief rested upon the testimony of the complainant, Sidney F., who was 14 years of age at the time of the trial. Sidney testified that in 1981, she and Ian began residing together in a familial situation following the marriage of Sidney's mother and Ian's father. The family unit, consisting of mother, stepfather, Sidney, Sidney's brother Davin, and stepbrother Ian, resided together in the stepfather's Upper St. Clair home. Sidney's other stepbrother, Andre, was in the primary custody of his and Ian's mother. That custody arrangement called for Andre to be in the stepfather's home every other weekend from Friday evening through Sunday evening, with Ian spending the alternate weekend with Andre in their mother's home.

1. The dates charged in the indictment reflect the fact that the appellant turned 18 on April 9, 1984, thus allowing the Commonwealth to proceed against him as an adult.

Sidney testified that early in their experience living in this newly formed family unit, Ian would act as the babysitter as he was 16, she was only 8, and Davin and Andre were each 10 years of age. Mother and stepfather had a moderate social schedule. Sidney testified that she had no recollection of her mother and stepfather going out together on any evenings during the week. She testified that they had season tickets to the Pittsburgh Symphony for the Friday evening performances, and occasionally went out to dinner or to a movie on a weekend evening. It was during these social outings of the parents that Sidney claims to have been sexually assaulted on a regular basis by Ian, beginning in 1981, approximately three years prior to the initial date charged in the indictment.

According to Sidney's testimony, the sexual encounters occurred on a regular weekly basis for over three years and occurred in exactly the same manner on each occasion. She testified that the assaults always occurred on a weekend evening when her parents were out and Ian was babysitting. She stated that Andre was never present in the home when the assaults occurred.[2] Sidney did testify that Davin was present but that he was never aware of what was transpiring between Ian and her. Davin did not testify. Sidney testified that on each occasion that she was assaulted, Ian carried her out of the room where the "children" were playing or watching TV to another part of the house and removed her clothing, and that no words were ever spoken between she and Ian during the assaults. Sidney also testified that she never experienced any pain during the sexual assaults, and that she never cried out during the assaults or complained to anyone about what was occurring between Ian and her. Further, she never objected to being left in Ian's care when her mother went out, and her relationship to Ian, was in all other respects, uneventful. Although Sidney did testify at the time of trial that she was afraid of Ian and his father, she testified that she did not

2. According to the custody agreement concerning Ian and Andre, the two brothers were to be together every weekend, Friday evening through Sunday evening, in either their mother or father's home. This arrangement was attested to by several witnesses, including Sidney.

have that fear at the time the assaults were supposedly taking place.

Ian testified in his own behalf, denying all the allegations of sexual assault. His testimony was directed to the time period charged in the indictment. Specifically, he testified that from April through September of 1984, he no longer acted as the babysitter as Sidney, Davin, and Andre were old enough to be left in their own care. (Sidney corroborated this point by admitting that as she and Davin got older and Ian was working, Ian no longer acted as their babysitter.) Also, during the time period of April through September of 1984 Ian was employed as a busboy/waiter at a local restaurant every Tuesday and Thursday evening and most Friday and Saturday evenings. In addition to carrying a heavy school schedule, as 1984 was his senior year of high school, Ian was also involved in extracurricular school activities, and was preoccupied with spending time with his girlfriend.

Prior to the 1983–1984 school year, Sidney and her new "family-unit" moved from Upper St. Clair to a home in the Northside section of the city of Pittsburgh. Ian, however, continued to attend high school in Upper St. Clair, a number of miles away. Thus, much of Ian's time was consumed by traveling between home and school, and when he had activities requiring his presence at school in the evenings, he did not return to his Northside residence in the hours between classes and his additional school activities. Ian's girlfriend, Liz Ramsey, testified that Ian spent a great many afternoons and evenings at her family home in Upper St. Clair during the 1983–1984 school year due to the geographic problem of attending school in Upper St. Clair and living in the Northside.

Both Sidney and Ian testified that the relationship between their respective parents was stormy. In fact, during the time period charged in the indictment, the atmosphere in the household was severely strained. Ian related to the jury that their "parents" engaged in physical confrontations: Sidney's mother frequently physically abused his father; his father maintained a constant retaliation of verbal, and occasionally

physical, abuse. Sidney testified that she hated her stepfather. Ian confirmed that there was a bitter and distant relationship between Sidney and his father. According to Ian, his father really had no relationship with Sidney or her brother Davin; the stepfather, in essence, ignored his stepchildren.

Andre, Ian's brother, testified that the violence and bitterness between his father and Sidney's mother became so overwhelming that he ceased his weekend visitations to his father's home for a four month period during the 1983–1984 school year. Andre testified that, in spite of the constant fighting between their respective parents, all the stepsiblings got along well and that he never noticed anything unusual in the relationship between Sidney and Ian. In addition, Andre testified that he could recall no instance when Ian carried Sidney out of the room and remained alone with her in another part of the house. Andre also confirmed the fact that Sidney often expressed her hatred for his father (her stepfather).

The Commonwealth presented no physical evidence. The Commonwealth did call three young women who testified that they had each been told by Sidney that Ian had "touched" her in a way she did not like. Lori Gump testified that during the summer of 1985, she was one of Sidney's camp counselors at a church camp when Sidney confided in her that her brother, Ian, had "touched" her in a way that caused her to be uncomfortable. Lori could not recall any specific statements that Sidney made to her. Lori did recall comforting Sidney, whom she described as being emotionally upset during this conversation. Lori took no further action on behalf of Sidney after this conversation and did not reveal any concern about the relationship between Sidney and Ian to any other members of the church or to Sidney's mother.

The following summer, 1986, Sidney had a similar conversation with her camp counselor, Lisa Hutchinson. Lisa could not recall anything specific that Sidney had said, only her recollection that Ian had done something to Sidney that caused her to be upset. Lisa also comforted Sidney at the

time of the conversation and also failed to report the conversation or any concern about Sidney and Ian's relationship to anyone else at the camp or to Sidney's mother.

The third young lady was Joan DeCarlo, Sidney's best friend. She testified that during a slumber party in March of 1986, Sidney confided to the girls at the party that her brother (Ian) had touched her and that she didn't like it. Again, this report was not made known to any interested adult and no details of the "touching" were elaborated upon.

Sidney's mother and Ian's father finally separated in November of 1986. Sidney, according to her testimony and that of Ian, was glad that their "parents" were separating. In December of 1986, Sidney's mother sought out Ian's help in achieving a reconciliation with his father. Shortly after Sidney became aware of the impending reconciliation, Sidney told her aunt that Ian had sexually assaulted her. At her aunt's insistence, Sidney told her mother that Ian had sexually assaulted her. In January of 1987, Sidney's mother took Sidney to file a report of sexual assault with the Pittsburgh Police. In that report, Sidney stated that she had no recollection that Ian penetrated her during any of these sexual assaults.

The above summary concludes our review of the testimony presented in the light most favorable to the Commonwealth as verdict winner. *Commonwealth v. Meadows,* 471 Pa. 201, 369 A.2d 1266 (1977). The appellant argues, that taking all the evidence in the light most favorable to the Commonwealth, there was insufficient evidence presented from which the jury could conclude beyond a reasonable doubt that any single act of rape occurred during the time period charged in the indictment. Essentially, appellant asserts that the testimony presented to the jury was so unreliable and contradictory that their verdict could only have been arrived at through speculation and conjecture.[3]

3. The appellant characterizes his questions presented on appeal as challenges to the "weight" and sufficiency of the evidence. An allegation that the verdict is against the "weight" of the evidence is a matter to be resolved by the trial court:

When an appellate court is required to review assertions that the evidence was insufficient to sustain the verdict, as there was no reliable evidence presented as to each element of the offense charged, the appropriate standard for review is as follows:

Normally, the evidence is deemed to be sufficient where there is testimony offered to establish each material element of the crime charged and to prove commission of the offense by the accused beyond a reasonable doubt. The question of credibility is left to the jury and the verdict will not be disturbed if the jury determines the evidence is worthy of belief.

We have, however, made exception to the general rule that the jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture.

Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution.

\*      \*      \*      \*      \*      \*

This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

*Commonwealth v. Smith,* 502 Pa. 600, 604–605, 467 A.2d 1120, 1122 (1983), (quoting *Commonwealth v. Farquharson,* 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976) (citations omitted)).

While there may be some legitimacy for a trial court, who has also observed the witnesses as they testified, to consider the weight of the evidence and to that extent review the jury's determination of credibility, there is surely no justification for an appellate court, relying upon a cold record, to exercise such a function.
*Commonwealth v. Farquharson,* 467 Pa. 50, 59–60, 354 A.2d 545, 550 (1976).

The essence of the criminal act of rape is involuntary submission to sexual intercourse. *See Commonwealth v. Mlinarich,* 518 Pa. 247, 542 A.2d 1335 (1988). A criminal prosecution also requires proof beyond a reasonable doubt that the accused committed the offense charged at the time specified within the indictment. *See Commonwealth v. Devlin,* 460 Pa. 508, 333 A.2d 888 (1975).

In order for the jury in this case to have concluded that Sidney was forcibly raped by Ian, the jury would have had to conclude that the child had been forced to submit to sexual intercourse at least once between April 9, 1984 and September 19, 1984. Since there was no direct evidence of sexual intercourse between those dates, the jury in order to convict, would have had to conclude, beyond a reasonable doubt, that the child had been forced to submit to sexual intercourse over 300 times, without ever feeling pain, without any physical evidence to support the contention that she was so victimized, and without any specific recollection by Sidney as to a date certain upon which even one of the several hundred assaults occurred.

Taking all the evidence in the light most favorable to the Commonwealth, the record is riddled with critical inconsistencies. Sidney's initial accusations that Ian "touched" her did not arouse any untoward suspicion in her friend Joan or either of her camp counselors. In fact, none of the three witnesses testifying to the touching comments could recall specific complaints of sexual assault. Indeed, in her initial report to the police, Sidney could not recall having been penetrated by Ian. In her original report to the District Attorney, a prosecution was declined because Sidney was unable to offer sufficient testimony as to the material elements of the crime of rape. The timing of these initial complaints to law enforcement authorities coincide precisely with the pending reconciliation of her mother and stepfather. This fact is important in light of Sidney's repeated expressions of hatred for her stepfather.

Sidney's testimony as to when any particular act of rape occurred is disturbingly vague. She initially insisted that the

assaults only occurred on Friday or Saturday evenings. She also maintained that Andre was never present when the assaults occurred. However, when confronted with her own testimony that Andre was in her home every other weekend from Friday evening to Sunday evening and that on the alternate weekends Ian was not in the home, she testified that the assaults occurred at another time. However she failed to specify when that particular opportunity arose. Sidney steadfastly maintained that the assaults only occurred when Ian was babysitting, and, as she testified that her parents only went out on Friday or Saturday evenings, that would have been the only opportunity for Ian to have assaulted her.

The most striking inadequacy in the Commonwealth's case however, is the fact that Sidney insisted that the assaults only occurred when Ian was babysitting and yet she also admitted that during the time period charged in the indictment (April through September 1984), Ian no longer acted as the babysitter. This point is extremely troublesome when considered along with Sidney's description of the numerous rapes. Sidney's testimony described only one specific act of intercourse which she states occurred in 1981, shortly after she and Ian began living within the same family unit. Sidney never offers testimony from which the jury could reasonably conclude that any particular act of rape occurred other than the one incident described in 1981. In fact Sidney corroborates Ian's testimony that not only was he no longer the babysitter in 1984, but that he was rarely even in the family home during that time period. The total failure of the Commonwealth to present any evidence that a single act of intercourse occurred during the period of April through September 1984 casts serious doubt upon the jury's ability to reasonably conclude that any criminal activity occurred during the time period charged. *Devlin, supra,* 460 Pa. 508, 333 A.2d 888 (1975) (the date of the offense charged must be proven with reasonable certainty).

The lack of evidence as to when the alleged assaults occurred is made even more striking by the fact that Sidney offered one scenario, and one scenario only, for each one of the 300 or more alleged incidents of sexual assault. She stated

that the assaults always happened in the same way. She was carried out of the room where she had been watching TV with her brother, Ian undressed her, and lay on top of her. Her resistance was always the same, never verbal. She merely attempted to sit up and she was pushed back down. No words were ever spoken. Ian never threatened or bribed Sidney in order to force her compliance or silence regarding the sexual assaults.

Thus, in keeping with our standard of review as set forth in *Smith* and *Farquharson,* we are compelled to conclude that the evidence presented at trial when carefully reviewed in its entirety, is so unreliable and contradictory that it is incapable of supporting a verdict of guilty, and thus, is insufficient as a matter of law.[4] Having reached this conclusion after careful and meticulous review of the record presented to this Court, we find that the verdict of the jury was not based on anything more than speculation and conjecture.

Accordingly, the judgment of sentence is reversed and the charges are dismissed.

LARSEN, J., did not participate in the consideration or decision of this case.

---

**4.** When a conviction is reversed upon the ground that the prosecution has failed to present sufficient evidence, the double jeopardy provision of the Fifth Amendment to the United States Constitution prohibits retrial. *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982); *Commonwealth v. Vogel,* 501 Pa. 314, 461 A.2d 604 (1983), *cert. denied,* 465 U.S. 1104, 80 L.Ed.2d 133, 104 S.Ct. 1603 (1984), *sub. nom. Vogel v. Pennsylvania,* 790 F.2d 368 (3rd Cir.1986) (habeous corpus proceedings).