J-S59004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
BASILIO DONES :
:
Appellant : No. 2055 EDA 2018

Appeal from the Judgment of Sentence Entered June 4, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0000783-2016

BEFORE: LAZARUS, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.: **FILED JANUARY 10, 2020**

Basilio Dones appeals from his judgment of sentence,[1] entered in the

Court of Common Pleas of Philadelphia County, after a jury convicted him of

rape of a child,[2] unlawful contact with a minor,[3] indecent assault,[4] and

---

[1] While Dones' notice of appeal states that he is appealing from the order denying his motion for extraordinary relief for a judgment of acquittal, the caption correctly reflects that the appeal is taken from his judgment of sentence. ***See Commonwealth v. Chamberlain***, 658 A.2d 395, 397 (Pa. Super. 1995) (order denying post-sentence motion acts to finalize judgment of sentence; thus, appeal is taken from judgment of sentence, not order denying post-sentence motion).

[2] 18 Pa.C.S.A. § 3121(c).

[3] 18 Pa.C.S.A. § 6318(a)(1).

[4] 18 Pa.C.S.A. § 3126(a)(7).

corruption of minors.[5]  On appeal, Dones contends that the evidence at trial was so contradictory and unreliable that it was insufficient to sustain his convictions.  Upon careful review, we affirm.

In or around 2006, the victim, S.O., moved to her home on Glenloch Street in Philadelphia with her maternal grandmother, M.D., her aunt, J.V., and her uncle, C.V.  N.T. Trial, 3/15/18, at 11-12, 59.  In or around 2007, Dones, S.O.'s 21-year-old cousin, moved into the Glenloch Street house to live closer to Lincoln Technical Institute where he attended auto mechanic classes.  Trial Court Opinion, 4/30/18, at 3.  At the time of the incidents, which occurred between 2006 and 2008, S.O. was between the ages of seven and eight.  *Id.*  At all times relevant hereto, S.O.'s father was incarcerated, and S.O. saw her mother, U.V., approximately every other weekend.  *Id.* at 2.

> The first incident happened after [Dones, S.O., and M.D.] had watched television when it was still light outside.  After [M.D.] went upstairs to her room, [Dones] told [S.O.] to follow him to his room.  [Dones] then told her to stand facing the corner of the bedroom.  [S.O.] remembers her pants and underpants being down to her ankles, although she does not remember how they came off, and hearing the sound of "a wrapper being torn apart." She glanced at the bed and saw that it was a condom wrapper. [S.O.] then felt [Dones] standing close behind her and making body motions "back and forth" against her.  She could feel his weight on her back and felt his penis in between her legs.  [Dones] would ask [S.O.] during [the assault,] "does it hurt." [S.O.] does not know or remember feeling whether or not [Dones'] penis went into in any parts of her body.  This back and forth motion would occur for "a little while," then [Dones] would tell [S.O.] that she could pull up her pants and leave.  Afterwards, [S.O.] went to

_____

[5] 18 Pa.C.S.A. § 6301(a)(1).

[M.D.'s] room, "cuddled up next to her and cried [herself] to sleep." [S.O. also testified that during these experiences, she was "too young to understand" what was happening, and that "[her] body just shut down on [her], like [she] was just in shock." N.T. Trial, 3/15/18, at 31, 65.]

[Although she testified at the preliminary hearing that these assaults occurred two to four more times, S.O.] testified [at trial] that these assaults occurred more than five times in the same routine with her facing the wall, the condom being opened, and his motions back and forth with his penis while both [Dones] and [S.O.] were standing upright. When [S.O.] began experiencing pain and a burning sensation when urinating her grandmother took her to a doctor and she was prescribed antibiotics and other medicine and was diagnosed as having a vaginal infection. This infections [sic] lasted for "maybe months" and ceased when [Dones] moved out. [S.O.] did not speak to anyone, including family members, about [Dones'] actions until the ninth grade when [she] told her best friend Calvin Gainey and [another female friend] about what [Dones] did to her. During the period of time between the first incident and her ninth grade year, [S.O.] testified that she felt depressed and experienced traumatic flashbacks of the assaults.

[S.O.] also testified as to another incident that happened several years later between 2014 and 2015 at the Lawrence Street residence after her high school classes had let out for the day. [Dones] and his mother were visiting while [S.O.] babysat her younger cousin. [Dones'] mother stepped out and [Dones] asked [S.O.] where his mother had gone. At the time, [S.O.] was on the phone with her friend, Calvin Gainey. She testified that at some point she [brought] her younger cousin upstairs. She testified that she remembered "running up the steps and [Dones] was chasing behind [her]." When [S.O.] went into her bedroom, [Dones] prevented her from shutting the door, which caused her to trip. [Dones] then pinned [S.O.] down on her bed with his weight on top of her. Before she tripped, [S.O.] was able to hit the "Face[T]ime button" on her phone so that Calvin Gainey could see what was happening from [the] front camera on her phone. She heard Calvin say "what the F you doing" twice to [Dones].

- 3 -

After the second time, [Dones] got off of [her]. He then left the bedroom and the house.[6]

[S.O.] further testified that when she was fifteen (15) and living on Lawrence Street she felt depressed and began cutting herself. She attributed these feelings to the memories of what [Dones] had done to her. She would call her friend Calvin or her female friend whenever she saw [Dones]. She would also lock herself and her female friend in her bedroom to avoid [Dones].

[S.O.] testified that that she had not spoken to her family about [Dones] sexually assaulting her because she felt "ashamed" and did not know how to file a report. However, during her tenth grade year in high school, [S.O.] told her paternal grandmother [N.M.] that she had been raped by [Dones]. [N.M] called the Philadelphia Department of Human Services [(DHS)] the following morning. When DHS came one or two days later, [M.D.] told [S.O.] to close the case over health concerns for [Dones'] father, who was [M.D.'s] brother. After the visit from DHS, several family members questioned [S.O.] about the assaults. [S.O.] was

_____

[6] Gainey testified about this incident between S.O. and Dones and also gave a statement to the police about it. The trial court summarized Gainey's testimony as follows:

During one of their regular conversations when they were talking on the phone using Face[T]ime, [Gainey] heard S.O. say, "oh shit, my cousin's here." He stated that he then was able to watch on his phone and saw [Dones] chase S.O. into her room while she shouted at him to get away. [Gainey] also saw [Dones] stick his foot in the doorway 'so like he could prevent [S.O.] from shutting the door all the way fully.' [Gainey] stated that he was in shock from witnessing this incident without being able to do anything. He testified that when he saw [Dones] pin S.O. to the bed, he yelled into his phone to [Dones], 'what the fuck is you doing?' When [Gainey] told [Dones] to 'get off' of S.O., [Dones] grabbed the phone, saw [Gainey's] face, and [got] off of [S.O.]. [Dones] then called [Gainey] a 'pervert.' [Gainey] testified that he had never met nor seen [Dones] prior to this [F]ace[T]ime call. Sometime around November of 2015, [Gainey] gave a statement to the police regarding this incident.

Trial Court Opinion, 4/30/18, at 8.

- 4 -

interviewed [on November 12, 2015 by Colleen Getz of the Philadelphia Children's Alliance (PCA)].

*Id.* at 3-5.

During that interview, S.O. explained that Dones raped her more than once, and that "the main thing [she] remember[s] is [that she was] eight." *Dones – Recorded Interview of S.O.*, 11/12/15, at 5:55-6:30. She stated during this interview that Dones said to her "let's go upstairs" before the assault, and asked her "did it hurt" during the incident. *Id.* at 8:55-10:49. She described standing facing the corner of the bedroom, hearing a wrapper opening, and seeing a condom wrapper on Dones' bed. *Id.* S.O. stated that Dones inserted his penis into her vagina and that "it hurt it." *Id.* at 11:05-12:39. At trial, the jury viewed this recorded interview. Michele Kline, Lead Forensic Interview Specialist at the PCA, testified at trial that interviewers including Colleen Getz typically refrain from asking children specifically about when and how frequently abuse happened "because most children are not able to accurately provide that information." Trial Court Opinion, 4/30/19, at 11.

Dones took the stand in his defense and denied that the 2015 incident that Gainey and S.O. described ever occurred. Trial Court Opinion, 4/30/19, at 12. He also testified that none of the sexual assaults that S.O. described had occurred, and he denied ever being around S.O. while he was attending Lincoln Technical Institute. *Id.* Dones testified that he never had any issue with Gainey, N.M., or U.V., and that his relationships with M.D. and S.O. were good. *Id.* at 204-206. He then testified that all of those witnesses against

him were lying, and that they "probably want to take [him] down." *Id.* at 207.

According to Dones, S.O. and the other witnesses "just picked [him] out of nowhere" to take the blame for raping S.O. "because basically [he] was never around [S.O.] at that time," he was "a good person," and they were "jealous of [him]" for having a job and a daughter. *Id.* at 203-209. On cross-examination, the Commonwealth confronted Dones with contradictions in his own testimony and in his statement to police regarding the 2015 incident. *Id.* at 211-215.

At trial, Dones presented several character witnesses. Trial Court Opinion, 4/30/19, at 12. Each witness testified to Dones' good character and that he was a peaceful, nonviolent person and had an excellent reputation in the community. *Id.*

After a three-day jury trial held in March 2018, a jury convicted[7] Dones of the above-mentioned crimes.[8] On June 4, 2018, the trial court sentenced

_____

[7] Dones was arrested and charged with rape, unlawful contact with a minor, indecent assault, corruption of minors, unlawful restraint, simple assault, and recklessly endangering another person. The Commonwealth withdrew the latter three charges before trial.

[8] Prior to Dones' sentencing hearing, the court conducted a hearing on his motion for a judgment of acquittal with respect to the rape charge. *See* Pa.R.Crim.P. 704(B). The court denied the motion, stating:

> [S.O.] was very clear about this condom, this wrapper that was taken out each time. She was very clear that [Dones] was moving

Dones to an aggregate term of 10 to 20 years' incarceration. Thereafter, Dones filed a timely motion for reconsideration of sentence alleging his sentence was excessive, which the court also denied. Dones then filed a timely notice of appeal and court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Dones raises a single issue for our review: "Is the evidence sufficient to convict [Dones] of the charges of rape, unlawful contact with a minor, indecent assault, and corruption of minors?" Brief of Appellant, at 5.[9]

_____

> back and forth and pressing on her. She wasn't completely clear whether the penis went in her, but the question is if somebody takes a condom out and somebody is moving back and forth behind somebody and has an [eight]-year-old to the wall and they're feeling pressure, the jury can determine that there was penetration, however slight, which is what the issue is for the rape charge. From having reviewed all of the testimony of her, both direct and cross, I believe that there was a sufficient basis for the jury's verdict and I am going to deny the motion for relief.

N.T. Sentencing, 6/4/18, at 10.

[9] In its Rule 1925(a) opinion, the trial court interpreted Dones' claim as a challenge that the verdict was against the weight of the evidence. *See* Trial Court Opinion, 4/30/19 at 13-16. In its Appellee's brief, filed almost two months late, the Commonwealth also addresses Dones' appeal as a challenge to the weight, rather than the sufficiency, of the evidence. However, Dones raises no argument on appeal relating to the weight of the evidence in this case; rather, the sole argument in his brief concerns the sufficiency of the evidence presented at trial, arguing that the Commonwealth failed to satisfy its burden of proving each element of each crime charged beyond a reasonable doubt. Brief of Appellant, at 30-33. Thus, we confine our review to a sufficiency of the evidence claim.

Dones argues that the evidence presented at trial is so unreliable and contradictory that it is incapable of supporting a verdict of guilty, and thus, is insufficient as a matter of law.  Brief of Appellant, at 63.  "Normally, evidence is deemed to be sufficient where there is testimony offered to establish each material element of the crime charged and to prove commission of the offense by the accused beyond a reasonable doubt." *Commonwealth v. Smith*, 467 A.2d 1120, 1122 (Pa. 1983).  There is, however, an exception to this general rule, known as the "*Bennett* principle."  *See Commonwealth v. Bennett*, 303 A.2d 220 (Pa. Super. 1973); *see also Commonwealth v. Farguharson*, 354 A.2d 545, 550 (Pa. 1976).

> Our Court [has] recognized that, in those extreme situations where witness testimony is so unreliable and contradictory that it makes the jury's choice to believe that evidence an exercise of pure conjecture, any conviction based on that evidence may be reversed on the grounds of evidentiary insufficiency, since no reasonable jury could rely on such evidence to find all of the essential elements of the crime proven beyond a reasonable doubt.

*Commonwealth v. Brown*, 52 A.3d 1139, 1156 n.18 (Pa. 2012).

"The *Bennett* principle is applicable only where the party having the burden of proof presents testimony to support that burden which is either so unreliable or contradictory as to make any verdict based thereon obviously the result of conjecture and not reason." *Farguharson*, 354 A.2d at 550.  The *Bennett* principle, however, does not apply to every case involving allegedly contradictory or inconsistent testimony. *Commonwealth v. Grant*, 135 A.3d 649 (Pa. Super. 2015).

In **Bennett**, the Commonwealth predicated its case upon the testimony of one individual, Harry Jones, who sought to implicate the defendant in the crime of receiving stolen property (an automobile). **Bennett**, 303 A.2d 220, 220 (Pa. Super. 1973). At trial, Jones gave

> several wholly different, conflicting and inconsistent versions of when and how he had told [the defendant] that the car had been in fact stolen by [Jones]. On a previous occasion, Jones had denied he ever conveyed to defendant knowledge of the car's theft. With each new version [of the car theft story,] Jones would recant the previous one and protest that the newest version was in fact the true one.

*Id.* On appeal, our Court reversed the defendant's judgment of sentence, noting that the Commonwealth presented the jury "*not with a mere conflict or contradiction in testimony which was reasonably reconcilable*," but instead with testimony so contradictory on the basic issue as to make any verdict based thereon pure conjecture. *Id.* at 221 (emphasis added). **Cf. Commonwealth v. Smith**, 467 A.2d 1120, 1123 (Pa. 1983) (declining to apply **Bennett** where reconciliation of conflicts in testimony not impossible).

Our Supreme Court followed **Bennett** in **Commonwealth v. Karkaria**, 625 A.2d 1167 (Pa. 1993), the primary case relied upon by Dones to support his argument on appeal. In **Karkaria**, the victim's testimony relating to alleged incidents of sexual assault was so internally inconsistent that the Court was "compelled to conclude" that the evidence presented at trial was insufficient to support a guilty verdict. *Id.* at 1172. At trial, the victim offered different, contradictory accounts of when the defendant assaulted her. *Id.* at

1171. The victim initially testified that her stepbrother, A.K., was never in the home during the assaults. *Id.* However, when confronted with her own testimony that A.K. and the defendant spent every weekend in the same household pursuant to a custody agreement, the victim testified that the assaults occurred at another time, failing to specify when that particular opportunity arose. *Id.* Moreover, the victim in *Karkaria* initially insisted that every assault occurred while the defendant babysat her, and later she admitted that the defendant no longer acted as her babysitter during the period charged in the indictment. *Id. See also Commonwealth v. Devlin*, 333 A.2d 888 (Pa. 1975) (noting criminal prosecution requires proof beyond reasonable doubt accused committed offense charged at time specified within indictment).

Additionally, the *Karkaria* Court pointed out that "no words were ever spoken" between the victim and the defendant before, during, or after any of the alleged assaults. *Karkaria*, *supra*, at 1171. Further, although the victim had told one friend and two camp counselors that the defendant had "touched" her, none of those individuals took any action in response, and, "[i]n fact, none of the three witnesses testifying to the touching comments could recall specific complaints of sexual assault." *Id.*

Upon review of the relevant case law and certified record on appeal, we conclude that the *Bennett* principle is inapposite here. The Commonwealth's witnesses' testimony was not so unreliable and contradictory as to make the

guilty verdict the result of conjecture. S.O. testified consistently about the timing, manner, and reporting of Dones' abuse. She testified consistently about her history of vaginal infections, which coincided with the time Dones lived with her, as well as the lasting psychological impact Dones' assaults had on her. Several members of S.O.'s family, Gainey, and Michele Kline of the PCA corroborated S.O.'s testimony extensively. The jury also considered Dones' own testimony,[10] which likely provided an "indicium of trustworthiness to the testimony of [the other witnesses] on the critical issue sufficient to permit the question to be properly left to the trier of fact." *See Farguharson*, 354 A.2d at 551 (Supreme Court concluded *Bennett* principle not applicable where Commonwealth's witness gave contradictory testimony that was corroborated in part by defendant's own testimony). Here, any misstatement or discrepancy in witness testimony was easily reconcilable. Dones is entitled to no relief.

Judgment of sentence affirmed.

---

[10] Although Dones conceded that he had no issues with Gainey or any family member, he was adamant that S.O. and the other witnesses were lying about him, and that in order to protect the true assailant, an unidentified family member, Dones was "picked [] out of nowhere" to take the blame for raping S.O. N.T. Trial, 3/15/18, at 203-209. Dones steadfastly maintained that he was conspired against "because basically [he] was never around [S.O.]," he is "a good person," and his family was "jealous of [him]" for having a daughter and a job. *Id.*

Judgment Entered.

Joseph D. Seletyn, Esc.
Prothonotary

Date: 1/10/20