J-A05031-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRUCE JONATHAN PALMER | : | No. 668 WDA 2019 |

Appeal from the Order Entered April 11, 2019
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s): CP-65-CR-0005686-2015

BEFORE: BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:          **FILED MARCH 27, 2020**

The Commonwealth appeals from the order of the Court of Common Pleas of Westmoreland County (trial court) granting the post-trial motion for a new trial of Bruce Jonathan Palmer (Palmer). After our careful review, we affirm.

We take the following factual background and procedural history from the trial court's April 11, 2019 opinion and our independent review of the certified record. On August 19, 2015, Palmer was charged with Rape by Forcible Compulsion, 18 Pa.C.S. § 3121(a)(1), and related charges[1] as the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The related charges included Rape by Threat of Forcible Compulsion, 18 Pa.C.S. § 3121(a)(2); Statutory Sexual Assault, 18 Pa.C.S. § 3122.1(b); four

result of his alleged rape and sexual assault of his step-daughter, Alyssa Farabaugh (Alyssa), between January 1, 2012, and January 1, 2015.[2] The trial court held a jury trial from August 6-8, 2018, at which Palmer and Farabaugh were co-defendants. The trial court provided the following thorough recitation of the significant facts adduced at trial:

> 1. Alyssa was born on May 20, 1998; at the time of trial, she was 20 years old. (N.T. Trial, at 97, 140). She testified that the first incident of abuse by [Palmer] occurred when she was roughly 12 years old and living at a home on Murtha Way in Latrobe, Pennsylvania with her mother, [Palmer], and her seven -year - younger sister, Autumn. (*See id.* at 99). Alyssa testified that approximately one week after the first incident of abuse she told her mother that "Bruce touched [her] inappropriately," and her mother did not believe her and grounded her. (*See id.* at 101).
>
> 2. Alyssa testified that when she was approximately 14 years old (i.e., between May 2012 and May 2013), she moved to a home on Dancer Road, along with her mother, [Palmer], Autumn, and her approximately 11-year-younger, half-brother, Xander. (*See id.* at 102, 141, 273). Alyssa testified that while living at Dancer Road, "Bruce got very sexual with [her]. He used to touch [her] inappropriately. It got to the point where he would start touching [her] underneath [her] clothes. And it got to the point where he would rape [her] and have sex with [her]." (*See id.* at 104).

_____

counts of Aggravated Indecent Assault, 18 Pa.C.S. § 3125(a)(1)-(3), (8); four counts of Indecent Assault, 18 Pa.C.S. § 3126(a)(1)-(2); Endangering the Welfare of Children, 18 Pa.C.S. § 4304(a)(1); and Corruption of Minors, 18 Pa.C.S. § 6301(a)(1)(ii).

[2] Alyssa's mother, Marie Ann Farabaugh (Farabaugh), was convicted of Endangering the Welfare of Children, 18 Pa.C.S. § 4304(a)(1), related to the offenses alleged against Palmer. The trial court also granted her motion for a new trial, and the Commonwealth has appealed that ruling at docket number 681 WDA 2019.

3. Alyssa testified that [Palmer] first raped her when she was 14 years old and living at Dancer Road, and thereafter that [Palmer] raped her "[a]bout once a week, maybe more," when she was fourteen, fifteen and sixteen years old. (*See id.* at 100, 105, 115). Alyssa testified that [Palmer] abused her for approximately five (5) years when she was between the ages of 12 to 16 years old; and that he raped her on a weekly basis during the ages of 14 to 16 years old. (*See id.* at 115).

4. During the period of time in which Alyssa testified the abuse and rapes occurred, *i.e.*, roughly 2010-2014, Alyssa's father and mother were engaged in a legal dispute regarding the custody of both Alyssa and Autumn. (*See id.* at 116).

5. As late as October 14, 2014, in the course and context of her parents' custody litigation, Alyssa expressed to her guardian *ad litem* and to the family court a continuing preference to live with her mother and [Palmer], rather than with her father. (*See id.* at 137-38, 222-25).

6. Alyssa told father's wife, Jodie, in mid-February 2015, that [Palmer] raped her "multiple times over a few years." (*See id.* at 111, 143, 197). Both Alyssa and Jodie testified that Alyssa got into a significant argument over the phone with her mother regarding Alyssa's use of marijuana shortly before Alyssa told Jodie that [Palmer] raped her. (*See id.* at 198, 2005). Alyssa's father called the police after Alyssa told him that [Palmer] raped her. (*See id.* at 111, 198). Alyssa's father testified that, later that same day, he relinquished custody of his 10-year-old daughter, Autumn, to Mother and [Palmer], for Mother's period of shared custody. (*See id.* at 230).

7. Alyssa testified that she told her grandmother about [Palmer's] actions when she stayed at her house. (*See id.* at 106). Alyssa testified that her mother picked her up from her grandmother's house and sometime thereafter made her call her grandmother on the phone and apologize for lying about what [Palmer] had done. (*See id.* at 106, 120).

8. Alyssa's maternal grandmother, Margaret Camilli ("Grandmother"), however, testified in substantial contradiction to Alyssa's testimony. Grandmother testified that Alyssa stayed over at her house one night in the summer of 2014, in approximately June 2014, and Alyssa got in [a] big phone

argument and fight with her mother over a misplaced iPad in the family home. (*See id.* at 174-79). Grandmother testified that Alyssa was extremely upset over the iPad argument, over being accused of lying about its location, and that Alyssa said [Palmer] probably hid the iPad to get her in trouble and that "we had sex." (*See id.* at 174-83). Grandmother testified that Alyssa said the next morning, "Grandma, I lied about that. That's all she said," and after that "everything was fine" and she took Alyssa home later that day. (*See id.* at 174-182).

9. Alyssa testified that while living at Dancer Road, she also told her then boyfriend, Stanley Ferry, about [Palmer's] abuse. (*See id.* at 107, 123-24). Mr. Ferry, however, also testified in substantial contradiction to Alyssa's testimony. Mr. Ferry testified that Alyssa told him that [Palmer] molested her when she was six years old, specifically, that Alyssa told him in 2014, when Alyssa was 16, that "[Palmer] went into her bedroom when she was six years old and molested her is what she said." (*See id.* at 188-193). Alyssa turned six years old in May 2004. [Palmer's] uncontradicted testimony at trial, however, was that he and Mother's romantic relationship began in 2007, when they worked together at Walmart, and that they moved in together in 2008. (*See id.* at 272, 274).

10. . . . [D]espite testifying to being raped by [Palmer] at least once weekly from the ages of 14 to 16 years old, and to an unspecified amount of inappropriate touching in the years prior since she was 12, Alyssa offered little in the way of specific testimony regarding these incidents. (*See id.* at 100, 104).

11. At sidebar with counsel during Alyssa's cross-examination at trial, Alyssa was directed out of the witness stand and was seated at the prosecution table, approximately two to three feet away from the front of the jury box. (*See id.* at 125-27). During sidebar, Alyssa began crying visibly while seated in front of the jurors. (*See id.* at 129). When Attorney Sweeney alerted the Court to Alyssa crying, the Court immediately took a ten-minute recess and had the jury escorted from the courtroom. (*See id.* at 127, 129). Jurors numbered four and five, who were seated closest to Alyssa, put their heads down. (*See id.* at 130).

12. During the recess in Alyssa's testimony, two jurors left the jury room to use the public restrooms. Mr. Sweeney represented to the Court that Alyssa was crying outside of the courtroom when

the jurors would have passed by her. (*See id.* at 129-30). After a discussion with counsel in chambers regarding these incidents, the Court expressed its willingness to consider options to mitigate the prejudicial effect of Alyssa's display of emotion so close to the jury, and its likely observation by two jurors outside of the courtroom. (*See id.* at 131-33). Defense counsel requested that the trial proceed without further curative action. (*See id.* at 133).

13. During her mother's testimony, Alyssa ran out of the courtroom, crying noticeably and disruptively in the jury's view, substantially as described by the [Palmer's] counsel on the record, who particularly described that Alyssa's crying became louder when she got out of the courtroom. (*See id.* at 279-284).

14. In another incident during her mother's testimony, while seated approximately 10 feet from the jury box, behind counsel's table, but in full view of the court and the jury, Alyssa "almost doubl[ed] down onto the floor. She was doing that for a while. She kind of disappeared between the victim advocate and her father." (*Id.* at 284). The court further notes that Alyssa's displays of emotion were muted while she testified from the witness stand, but were much more pronounced and demonstrative when not testifying. Upon retrospective consideration of these incidents, the court notes that Alyssa's melodramatic displays of emotion appeared to be at least in part contrived. (*See id.* at 284) (where the court initially noted that the substance of Alyssa's outburst was "more than [just] crying.").

(Trial Ct. Op., at 6-9) (footnotes and unnecessary capitalization omitted; some record citation formatting provided).

At the conclusion of trial, the jury convicted Palmer of all charges. On November 1, 2018, the trial court sentenced him to a term of incarceration of not less than four nor more than eight years, on the Rape by Forcible Compulsion count, with concurrent terms on the remaining charges. On November 13, 2018, Palmer filed a post-sentence motion seeking a new trial

based on the weight of the evidence.[3]  On April 11, 2019, after a hearing, the trial court granted the motion requesting a new trial, finding that the jury verdict was against the weight of the evidence.  The Commonwealth timely appealed and complied with Rule 1925.  *See* Pa.R.A.P. 1925.

The Commonwealth argues that the trial court abused its discretion in finding that the jury verdict was against the weight of the evidence.  (***See*** Commonwealth's Brief, at 13).  Specifically, the Commonwealth maintains that the trial court:

> Overstepped the limits of judicial discretion and invaded the exclusive domain of the jury by considering the credibility of Alyssa's testimony as a factor in overturning the jury's verdict and granting a new trial.  Second, the trial court's reasoning for finding Alyssa's testimony incredible are insufficient to sustain a challenge to the weight of the evidence, as the trial court failed to apply the laws of the Commonwealth to the facts of the case at hand.  Third, the trial court's issue with the timing and context of [] Alyssa's complaints is another insufficient reason to sustain a challenge to the weight of the evidence.  Finally, Alyssa's emotional displays in the presence of the jury is not a sufficient reason for the trial court to overturn the jury's verdict, since [neither] the trial court nor [Palmer has] shown any prejudicial effect by Alyssa's emotional behavior. . . .

(***Id.***).

_____

[3] The motion also included claims of ineffectiveness of trial counsel.  However, the court exercised its discretion and deferred review of these collateral claims.  (***See*** Trial Court Opinion, 4/11/19, at 2); ***Commonwealth v. Holmes***, 79 A.3d 562, 580 (Pa. 2013) (whether appropriate circumstances exist to warrant unitary review of collateral claims along with post-sentence motions left to trial court's discretion).

Palmer counters that the trial court properly exercised its discretion when it found that "it was a combination of the facts presented and events that occurred during the trial that resulted in a verdict that was contrary to the weight of the evidence[.]" (Palmer's Brief, at 9). Specifically, Palmer points to significant facts presented by the Commonwealth that contradicted and undermined Alyssa's testimony, the absence of other facts, and Alyssa's "numerous, histrionic displays of emotion in front of the jury . . . when she was not on the stand," that "compelled the award of a new trial so that right may be given another opportunity to prevail." (*Id.*).

We consider the following legal principles in considering this issue:

> The finder of fact—here, the jury—exclusively weighs the evidence, assesses the credibility of witnesses, and may choose to believe all, part, or none of the evidence. Issues of witness credibility include questions of inconsistent testimony and improper motive. A challenge to the weight of the evidence is directed to the discretion of the trial judge, who heard the same evidence and who possesses only narrow authority to upset a jury verdict. The trial judge may not grant relief based merely on some conflict in testimony or because the judge would reach a different conclusion on the same facts. Relief on a weight of the evidence claim is reserved for extraordinary circumstances, when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

*Commonwealth v. Sanchez*, 36 A.3d 24, 26-27 (Pa. 2011) (citations and quotation marks omitted). Although, generally, issues of credibility are solely for the jury,

> [w]hen a motion for new trial is made on the ground that the verdict is contrary to the weight of the evidence, . . . [t]he [trial] court need not view the evidence in the light most favorable

- 7 -

to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses. If the court concludes that, despite the abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

*Commonwealth v. Widmer*, 744 A.2d 745, 752 n.3 (Pa. 2000) at 752 n.3

(citation omitted).

On appeal:

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 753 (citations omitted; some evidence in original; some emphasis added).

Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Id.* (citation omitted).

Here, the trial court explained:

At trial, Alyssa's credibility was the crucial issue for consideration. No single matter . . . is by itself determinative of the issues presented. Taken together, however, the nature and

- 8 -

context of the contradictory testimony, the almost complete lack of detailed, corroborating testimony from the victim, the timing and context of the victim's initial complaints and the shadow cast over the trial by the victim's very visible, often melodramatic displays in front of the jury, compel this court to grant [Palmer's] motion for a new trial. Justice demands no less.

(*Id.* at 9) (unnecessary capitalization omitted).

After our own independent review of the record, we discern no manifestly unreasonable abuse of discretion where the trial court did not misapply the law, and there is no evidence in the record that its decision was the "result of partiality, prejudice, bias or ill will." **Widmer**, **supra** at 753 (citation omitted).

We further observe that as noted by the trial court, our Supreme Court's case of **Commonwealth v. Karkaria**, 625 A.2d 1167, 1170 (Pa. 1993), is instructive in this matter. In **Karkaria**, the defendant was charged with raping his step-sister, who provided the prosecution's sole evidence. She testified that defendant sexually assaulted her on a weekly basis for three years, in the same manner each time, while he babysat her on the weekends. **Karkaria**, **supra** at 1168. The Court examined whether the jury verdict was supported by sufficient evidence or by testimony "so unreliable and contradictory that their verdict could only have been arrived at through speculation and conjecture." **Id.** at 1170. The Court reversed the judgment of sentence, finding that it was "riddled with critical inconsistencies," such as (1) the lack of "untoward suspicion" raised by the victim's initial accusations; (2) the insufficient detail in her initial accusations and testimony; (3) the

timing and context of her initial complaints; (4) the victim's "disturbingly" vague and inconsistent testimony about when the alleged acts occurred; (5) the degree of revision in her testimony when confronted with conflict; and (6) the lack of detail supporting any revised or clarified testimony. ***See id.*** at 1171.

Particularly troubling to the Court was "[t]he lack of evidence as to when the alleged assaults occurred" and that the victim "offered one scenario, and one scenario only, for each one of the 300 or more alleged incidents of sexual assault." ***Id.*** Based on the foregoing, the Court concluded that the evidence was so unreliable and contradictory, it was insufficient to support the guilty verdict as a matter of law. ***See id.***

The factors on which our Supreme Court relied are mirrored in the case before us. Alyssa's initial complaints did not raise any "untoward suspicion." In fact, her mother grounded Alyssa for lying, her grandmother said she made the accusation in an outburst and then retracted it the next day, and her biological father relinquished custody of her younger sister, Autumn, to mother and Palmer, for mother's period of shared custody, immediately after learning of Alyssa's accusation against Palmer. Additionally, while Alyssa alleges that the sexual misconduct occurred for approximately five years, she was able to provide only limited, vague scenarios about where these incidents allegedly occurred, with no elaboration or specific detail. Alyssa made her allegations immediately after intense arguments with her mother about her

marijuana use and her alleged theft of her sister's missing iPad, which was discovered in Alyssa's bedroom, thus making the timing and context of her complaints suspect. Additionally, her complaint to her boyfriend that Palmer raped her when she was six years old was inconsistent with her own story that the abuse began when she was twelve, and Palmer's undisputed testimony that he was not in a relationship with Farabaugh until after that time.

Therefore, the foregoing, when analyzed under *Karkaria*, support the trial court's finding that the jury's verdict was against the weight of the evidence because the evidence was "so unreliable and contradictory that their verdict could only have been arrived at through speculation and conjecture." *Id.* at 1170.

Further, we observe that in addition to the *Karkaria* factors, the court, which was in the best position to view the trial, observed Alyssa's "melodramatic displays" (Trial Ct. Op., at 8), further supporting its finding that justice demands a new trial. Specifically, the record reflects that (1) during a sidebar, Alyssa visibly cried in front of the jurors while seated at counsel table, (*see* N.T. Trial, at 127, 129); (2) during a recess, two jurors left the jury room to use the public bathroom and passed Alyssa crying in the hallway, (*see id.* at 129-30); (3) during her mother's testimony, Alyssa ran out of the courtroom noticeably and disruptively crying in the jury's view (*see id.* at 281); and (4) in full view of the trial court and jury, Alyssa not only cried but "almost doubl[ed] down on the floor . . . for a while" during her mother's

testimony, (*id.* at 284). While the court and counsel acknowledged that Alyssa had the right to cry, the trial court pointed out in chambers that "[i]t was more than the crying." It was what the court perceived as the "overdramatic" nature of her behavior. (*Id.* at 284). ("It [was] almost doubling down onto the floor. She was doing that for a while."). In fact, defense counsel noted that should such behavior continue during closing statements, they would move for a mistrial, and the court acknowledged that it would have to consider it. (*See id.* at 281-84). Finally, the court observed, "Alyssa's displays of emotion were muted while she testified . . . but were much more pronounced and demonstrative when not testifying." (Trial Ct. Op., at 8).

Accordingly, based on all of the foregoing, under our narrow standard of review of the trial court's least assailable of rulings, we affirm its order finding that the verdict was against the weight of the evidence and granting a new trial in the interest of justice.[4]

---

[4] We recognize the Commonwealth's argument that "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Widmer*, *supra* at 272 (citation omitted). However, here, it was not merely a conflict in the testimony on which the trial court relied for its ruling. Instead, it was a totality of the evidence before it, including the nearly complete lack of detailed testimony from Alyssa, the timing and context of her initial complaints and her melodramatic displays in the jury's presence.

While the Commonwealth exhaustively reviews statements made by Alyssa, in the light most favorable to it, (*see* Commonwealth's Brief, at 21-25), we

J-A05031-20

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/27/2020

_____

reminded by the Commonwealth that this Court will not re-weigh the evidence or look at the record in the light most favorable to it in a weight of the evidence challenge.  **See Widmer**, **supra** at 753.

Additionally, we are cognizant that in sexual assault cases, the victim's testimony alone is sufficient, if believed.  **See Commonwealth v. Poindexter**, 646 A.2d 1211, 1214 (Pa. Super. 1994) (citing 18 Pa.C.S. § 3106).  However, as observed by our Supreme Court in **Karkaria**, **supra**, where the testimony is "so unreliable and contradictory that the[] verdict would only have been arrived at through speculation and conjecture[,]" a new trial is warranted.  **Karkaria**, **supra** at 1170.

Finally, the Commonwealth complains that the trial court improperly found that the timing and context of the initial complaints was suspect and ignored the testimony of its child sexual abuse expert who testified that the behavior and responses a child might exhibit if sexually abused.  (**See** Commonwealth's Brief, at 29-30).  However, again, we will not re-weigh the evidence, and merely because the trial court did not find this testimony significant enough to include it in its opinion, we cannot give it a greater weight than that provided by the trial court.

- 13 -