J-S15035-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SAMUEL LEE LOWRY, III | : | |
| | : | |
| Appellant | : | No. 1568 WDA 2019 |

Appeal from the Judgment of Sentence Entered November 2, 2018
In the Court of Common Pleas of Lawrence County Criminal Division at
No(s):  CP-37-CR-0001146-2014

BEFORE:   BENDER, P.J.E., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                **FILED MARCH 27, 2020**

Appellant, Samuel Lee Lowry, III, appeals *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Lawrence County following his conviction by a jury on the charges of rape of an unconscious victim, sexual assault, and indecent assault of an unconscious victim.[1]  After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant was arrested in connection with the rape of D.P., and represented by counsel, he proceeded to a jury trial.  The trial court has thoroughly set forth the evidence presented at trial as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3121(a)(3), 3124.1, and 3126(a)(4), respectively.

In early November 2014, [D.P.] was a 27-year-old female tenant of an apartment at *** Cuba Street, New Castle, Pennsylvania, which she shared with her boyfriend, [T.K.] and their daughter. N.T., 8/21/18, at 10, 12-13. On the evening of Friday, November 7, 2014, [D.P.] dropped off her daughter at [T.K.'s] mother's residence in Ohio at approximately 8:30 p.m. *Id.* After returning to the apartment at approximately 9:30 p.m., [D.P.] retired to her second-floor bedroom with [T.K.], where the two engaged in consensual oral sex before going to sleep. *Id.* A few hours later, shortly before 2:00 a.m. on November 8, 2014, [T.K.] woke up and got ready to go to work [for] his 3:00 a.m. to 2:00 p.m. shift as a laborer at Wheatland-American Cap. *Id.* at 87-88. At 2:02 a.m., [T.K.] exited the apartment, entered his vehicle, and drove away to go to work. *Id.* at 134. [D.P.], who slept nude that night as was common for her, remained in bed and asleep for another couple of hours, until she awoke amidst a sensation of dyspnea (difficulty breathing). *Id.* at 15. At this time, as she attempted to remove some blankets to circulate air around her, [D.P.] noticed a male stranger's nude body on top of her. *Id.*

[D.P.] immediately deduced that this unknown man was not [T.K.] because the stranger was licking and kissing her neck and left ear, which were things that [T.K.] never did. *Id.* More troublingly, the stranger had [D.P.] pinned down to her bed with his body weight and had the tip of his erect penis inserted into her vagina, despite [D.P.] having never provided her consent for this sexual encounter. *Id.* at 25. During his time on top of [D.P.], the man neither fully inserted his penis into her vaginal cavity nor ejaculated. *Id.* All the while, [D.P.], as she struggled to free herself, screamed and yelled at this unknown assailant to get off her and leave the apartment. *Id.* at 16. Eventually, [D.P.] was freed after the intruder rolled over to the other side of [D.P.'s] bed, and he began claiming that the two of them had been engaged in sexual activity throughout the night. *Id.* With the bedroom still dark, [D.P.] continued to order the intruder to leave, got out of bed, and made her way to a closet where she knew [T.K.], an avid hunter and target shooter, kept a loaded shotgun. *Id.* at 17, 96. [D.P.] retrieved the shotgun, sustaining a bruise in the process, but did not fire it at the intruder. *Id.* When the lights came on, [D.P.] instantly recognized the intruder as "Duke," a nickname for [Appellant] well known to both [D.P.] and the New Castle Police Department ("NCPD"). *Id.* at 20, 103.

[Appellant] then left the bedroom, went downstairs, and fled [D.P.'s] apartment through the back door. Meanwhile, [D.P.] quickly dressed herself and dialed 911, a call that records indicate was first received by the NCPD at 4:28 a.m. on November 8, 2014. The first officer to respond on the scene was then-Patrol Officer, now-Detective Brandon Hallowich of the NCPD, who arrived at 4:35 a.m. *Id.* at 102. After arriving at the apartment, Detective Hallowich met with a shaken and rattled [D.P.], and discussed with her the events that had recently transpired upstairs. *Id.* at 102. Detective Hallowich also observed the apartment's back door ajar, despite [D.P.'s] statements that she had locked the back door earlier that night, and concluded that [Appellant] had fled the scene through that door. *Id.* at 104. For this reason, Detective Hallowich advised other NCPD officers via radio to be on the lookout for [Appellant] in a southwesterly direction from the crime scene. *Id.* [D.P.] was then taken to Jameson Hospital by ambulance along with Detective Hallowich to complete a sexual assault examination kit. *Id.* at 106. The samples collected as part of this examination included a vaginal swab, a neck swab, and a swatch of [D.P.'s] underwear. *Id.* at 108. These samples were eventually transmitted to the Pennsylvania State Police ("PSP") Crime Lab in Greensburg, Pennsylvania, for DNA analysis. *Id.* at 107. Likewise, buccal swab samples of DNA were later collected and sent to the PSP Crime Lab from [D.P.], [T.K.], and [Appellant]. [D.P.] eventually returned home later that morning and phoned [T.K.] to inform him of what had happened. *Id.* at 92.

Meanwhile in the early morning of November 8, 2014, Detective Fred Buswell, also then a patrol officer for the NCPD, received the radio message about [Appellant's] escape route from [D.P.'s] apartment and shortly thereafter located [Appellant] on the back porch of an apartment at *** Halco Drive, New Castle, Pennsylvania, approximately one quarter-mile away from [D.P.'s] apartment. *Id.* at 158. Detective Buswell approached [Appellant], who appeared to be intoxicated, and questioned him as to his whereabouts earlier that night. *Id.* [Appellant], who exhibited a cooperative demeanor, claimed that he had been at *** Halco Drive all evening, an alibi that Detective Buswell immediately disbelieved when he observed that no lights were on at that apartment and that [Appellant's] shoes appeared to be wet from recently walking across the dewy early morning grass. *Id.* Detective Buswell then took [Appellant] into custody as a suspect in the crimes that had occurred at [D.P.'s] apartment. *Id.* In the course of frisking [Appellant] as part of the search incident to

arrest, Detective Buswell felt [Appellant's] erect penis, and then transported [Appellant] to the NCPD station for processing. *Id.* at 159. Detective Hallowich, who heard that [Appellant] had been taken into custody, also returned to the NCPD station and later recalled seeing surveillance footage that [Appellant] was masturbating that night while in the station's holding cell. *Id.* at 110. No police officers took a statement from [Appellant] that morning, Detective Hallowich explained, because he was thought to be intoxicated from alcohol or some unknown substance. *Id.* at 151. Following the events of November 8, 2014, [Appellant] was subsequently charged through the aforementioned information.

In her testimony at trial, [D.P.] provided additional context and background on her previous encounters with [Appellant]. [D.P.] knew [Appellant] prior to November 8, 2014, primarily due to [Appellant's] father renting a nearby apartment at \*\*\* Cuba Street. *Id.* at 26. [D.P.] explained that she and [Appellant] did not speak often and that when they did, the conversation rarely extended beyond a simple exchange of pleasantries. *Id.* at 27. Among the only extended interactions with [Appellant] that [D.P.] could recall was one rainy night some months prior to November 8, 2014, when she permitted [Appellant], who had knocked on her apartment's front door at 4:30 a.m., to sleep on her downstairs couch for a few hours until his father returned to his nearby apartment. *Id.* at 28. Even during this brief stay, [Appellant] displayed alarming behavior when he attempted to make his way upstairs, ostensibly to use the restroom despite the presence of a bathroom on the first floor, and made [D.P.] immediately uncomfortable. *Id.*

[Appellant's] troubling behavior manifested on another occasion at the apartment when [D.P.] and [T.K.] were present, as [Appellant], unannounced and uninvited, walked into the apartment and inquired about borrowing a cell phone. *Id.* at 66. After the incident on November 8, 2014, [D.P.] noted she endured a general harassment from her neighbors, supposedly for "snitching" on [Appellant], which years later evolved into patently false rumors that she had been having an affair with [Appellant] at the time of the incident. *Id.* at 29, 54-56, 70. Summarizing her pre-incident relationship with [Appellant], [D.P.] explained that, notwithstanding her charitable decision to provide him with a dry place to sleep on one isolated occasion, [Appellant] was at most a neighborhood acquaintance who at no time had any license or standing permission to enter her apartment and who at no time

was her consensual sexual partner. *Id.* at 67, 74. By contrast, [D.P.] testified that her most recent consensual vaginal sexual intercourse had taken place with [T.K.] on November 5, 2014. *Id.* at 64-65.

Besides [D.P.'s] eyewitness accounts of the events of November 8, 2014, Detective Hallowich testified at trial regarding footage, also admitted into evidence, from several surveillance cameras in the neighborhood surrounding [D.P.'s] apartment that recorded [Appellant's] movements in those early morning hours. Specifically, Detective Hallowich narrated clips that showed a young man who was wearing the same clothes later collected from [Appellant] after his arrest leave the apartment at *** Cuba Street at approximately 3:59 a.m., spend several minutes wandering around the neighborhood, and then walk up to [D.P.'s] apartment at *** Cuba Street and enter through an apparently unlocked front door before briefly toggling the switch for the apartment's front porch light. *Id.* at 136. Those same surveillance cameras had captured [T.K.] leaving the apartment as he left for work approximately two hours earlier. *Id.* at 133. Detective Hallowich explained that investigators at the crime scene found no sign of [Appellant] making a forced entry through the front door of [D.P.'s] apartment. *Id.* at 141. It appears that neither [D.P.] nor [T.K.] locked the apartment's front door that night because [D.P.] expected [T.K.] to do so as he left for work and [T.K.], who was running late that morning, may have absentmindedly forgotten to perform that task. *Id.* at 27, 96.

By November 2015, the DNA samples had been analyzed by the PSP Crime Lab, and the results synthesized into a published report that was eventually admitted as evidence at trial. At trial, the Commonwealth called Julia Garofalo ("Garofalo"), the forensic DNA supervisor at the PSP Crime Lab in Greensburg and the author of the DNA report. Garofalo, possessor of a master's degree in forensic science and an employee of the PSP since August 2012, was certified as an expert witness in DNA analysis. N.T., 8/22/18, at 13. Garofalo explained that her PSP lab, which is fully accredited and audited against FBI and PSP quality assurance standards, utilizes the standard DNA test known as short tandem repeat ("STR") that looks at 24 very specific areas on different chromosomes and evaluates the presence of a person's DNA by seeing how many repeats of a certain genetic sequence a person has at those 24 locations. *Id.* at 17-18. Garofalo described the testing process as a comparison of the repeats in question samples (e.g. those taken from a crime scene)

versus those from a known sample. *Id.* at 19. The goal of DNA analysis, Garofalo noted, is not to say definitively that a sexual assault occurred but rather that DNA was found at a certain place and time. *Id.* at 20. The results of these tests are expressed in the statistical terms of chances of finding identical DNA elsewhere in a given population. *Id.* at 23.

The question samples in this case were taken from the sexual assault examination kit performed in the early morning of November 8, 2014. Sample Q1 was from the vaginal swab, sample Q2 was a swab of [D.P.'s] neck, and sample Q3 was a swatch of [D.P.'s] underwear. Sample K1 was a buccal swab of [D.P.'s] DNA, sample K2 was a buccal swab of [Appellant's] DNA, and sample K3 was a buccal swab of [T.K.'s] DNA. Because samples Q1 and Q3 were determined to have a presence of sperm DNA, those samples were further divided into sperm and non-sperm portions, as is standard procedure. *Id.* at 29. For sample Q1, the major contributor to the sperm portion was matched to [T.K.], and the chances of this DNA sample of having come from another person were described as 1 in 940 octillion in the Caucasian population, 1 in 51 nonillion in the black population, and 1 in 110 octillion in the Hispanic population. *Id.* at 37. The major contributors to the non-sperm portions of sample Q1 were determined to be [D.P.] and a third, unknown individual. *Id.* at 39. For sample Q2, the two major contributors were determined to be [D.P.] and [Appellant], and Garofalo stated that it was 1.8 decillion times more likely in the Caucasian population, 14 nonillion times more likely in the black population, and 2.6 decillion times more likely that these two individuals contributed to the DNA to this mixture than two unknown individuals. *Id.* at 40. Trace amounts were also found from an unknown third person.

Lastly, for sample Q3, the results of the sperm portion showed a mixture of DNA from [T.K.] and [Appellant] that was 160 trillion times more likely in the Caucasian population, 470 billion times more likely in the black population, and 13 trillion times more likely in the Hispanic population to have come from those two individuals than two unknown persons. *Id.* at 43. While these statistical probabilities, the result of only having enough DNA to test six loci instead of the usual 24, were much lower than figures given for the vaginal and neck samples, Garofalo nonetheless noted that it was "still many times more likely that these two individuals contributed DNA as opposed to two unknown individuals in the population." *Id.* at 44. For the non-sperm

portion of sample Q3, it was determined that [D.P.] and [T.K.] were the primary contributors. *Id.* at 48. Importantly, with respect to sample Q2, Garofalo conceded the minute possibility that [Appellant's] DNA could have ended up on [D.P.'s] neck through transferred contact from other surfaces, but stated the presumption that his DNA ended up there through his saliva. *Id.* at 64. In concluding her testimony, Garofalo stood by her analysis and reiterated that her results were derived from approved scientific methodology. *Id.* at 56, 58. At the end of Garofalo's testimony, the Commonwealth rested its case-in-chief.

In rebuttal, [Appellant's] case-in-chief consisted exclusively of the testimony of Dr. James Girard, a Professor of Chemistry at American University in Washington, D.C. Testifying via Skype, Dr. Girard was certified as an expert witness in the field of DNA analysis. *Id.* at 92. With respect to Garofalo's report, which he had extensively reviewed before trial, Dr. Girard stated his general agreement with the results as pertaining to samples Q1 and Q2. *Id.* at 97, 111. The only area in which Dr. Girard expressed disagreement with Garofalo was with the conclusions on Q3, for which he felt that Garofalo "overstated the certainty" of the findings. *Id.* at 100, 116. Dr. Girard's conclusion was that [Appellant's] connection to the sperm portion of sample Q3 was much weaker than [T.K.], even though he admitted that he agreed with Garofalo's report as it pertained to four of the six loci tested on that portion. *Id.* at 101, 112. Dr. Girard also found fault with the failure of the PSP to run a Y Chromosome Test on the samples, despite such a test being standard protocol in rape cases. *Id.* at 105. At the conclusion of Dr. Girard's testimony, [Appellant] rested his case.

Trial Court Opinion, filed 12/5/19, at 4-12.

At the conclusion of all evidence, the jury convicted Appellant of the charges indicated *supra*,[2] and following a sentencing hearing, the trial court sentenced Appellant to an aggregate of eight and one-half years to twenty

---

[2] The jury acquitted Appellant on the charge of burglary of an overnight accommodation with a person present, 18 Pa.C.S.A. § 3502(a)(1).

- 7 -

years in prison. Appellant filed a timely, counseled post-sentence motion, which was denied by operation of law.

On March 26, 2019, Appellant filed a timely, counseled notice of appeal. However, instead of listing solely the lower court docket number pertaining to the instant case (CP-37-CR-1146-2014), counsel listed on the notice of appeal several lower court docket numbers pertaining to Appellant.[3] Accordingly, by judgment order filed on September 13, 2019, this Court quashed Appellant's notice of appeal pursuant to **Commonwealth v. Walker**, 646 Pa. 456, 185 A.3d 969 (2018).

On September 20, 2019, Appellant filed a timely, counseled PCRA[4] petition seeking the restoration of his direct appeal rights due to counsel's ineffectiveness in failing to abide by the dictates of **Walker**, **supra**. By order entered on October 15, 2019, the PCRA court reinstated Appellant's direct appeal rights, and on October 25, 2019, Appellant filed the instant counseled *nunc pro tunc* notice of appeal, which complies with the dictates of **Walker**, **supra**. On October 25, 2019, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant timely complied, and the trial court filed a Pa.R.A.P. 1925(a) opinion on December 5, 2019.

---

[3] For instance, counsel included the lower court docket number (CP-37-CR-0000401-2012) pertaining to a prior conviction of Appellant for which Appellant was on parole at the time he committed the instant offenses. Apparently, Appellant's parole was revoked and Appellant was resentenced in connection with that case. However, Appellant's current appeal relates only to his offenses at lower court docket number CP-37-CR-0001146-2014.

[4] Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.

In his first issue, Appellant contends the evidence was insufficient to sustain his convictions. Appellant avers that D.P.'s testimony was so inherently unreliable and contradictory that the jury's entire verdict is based on no more than surmise or conjecture. *See* Appellant's Brief at 32-35. Specifically, Appellant contends the evidence does not support the fact that D.P. was unconscious when the sexual activities between her and Appellant occurred, that D.P. was an unwilling participant in the sexual activity, or that D.P. was unaware the sexual activity was occurring. *Id.* at 23.

In reviewing sufficiency claims, we note:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Graham*, 81 A.3d 137, 142 (Pa.Super. 2013) (quotation marks and quotation omitted).

In the case *sub judice*, Appellant was convicted of the following crimes:

**§ 3121. Rape**

**(a) Offense defined.--**A person commits a felony of the first degree when the person engages in sexual intercourse with a complainant:

\*\*\*

(3) Who is unconscious or where the person knows that the complainant is unaware that the sexual intercourse is occurring.

18 Pa.C.S.A. § 3121(a)(3) (bold in original).

**§ 3124.1. Sexual assault**

Except as provided in section 3121 (relating to rape) or 3123 (relating to involuntary deviate sexual intercourse), a person commits a felony of the second degree when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent.

18 Pa.C.S.A. § 3124.1 (bold in original).

**§ 3126. Indecent assault**

**(a) Offense defined.--**A person is guilty of indecent assault if the person has indecent contact with the complainant, causes the complainant to have indecent contact with the person or intentionally causes the complainant to come into contact with seminal fluid, urine or feces for the purpose of arousing sexual desire in the person or the complainant and:

\*\*\*

(4) the complainant is unconscious or the person knows that the complainant is unaware that the indecent contact is occurring[.]

18 Pa.C.S.A. § 3126(a)(4) (bold in original).

In the case *sub judice*, in rejecting Appellant's sufficiency of the evidence claim, the trial court relevantly stated the following:

> [T]he Commonwealth's evidence established that [Appellant] engaged in sexual intercourse with [D.P.]. In her testimony, [D.P.] recalled waking up with the tip of [Appellant's] penis inside of her vagina. This provided evidence of "penetration, however slight," and established the element of sexual intercourse. [**See Commonwealth v. Wall**, 953 A.2d 581, 584 (Pa.Super. 2008) (holding the element of sexual intercourse is established entirely by evidence of penile penetration, "however slight," of the victim's vagina).] [D.P.] further testified that she had been asleep for some time prior to waking up with [Appellant] on top of her, which established the element[s] of unconsciousness[, as well as lack of consent and lack of awareness]. Thus, [D.P.'s] testimony alone established the critical elements of rape of an unconscious victim, [as well as sexual assault and indecent assault,] and was sufficient by itself to sustain [Appellant's] convictions[.] [**See**] **Commonwealth v. Gabrielson**, 536 A.2d 401, 409 (Pa.Super. 1988) ("[The] uncorroborated testimony of a rape victim, if believed by a jury, is sufficient to support a rape conviction.").
>
> Moreover, the Commonwealth's additional evidence supplements [D.P.'s] testimony and solidly establishes the identity of [Appellant] as the perpetrator of the crimes. Detective Hallowich narrated the surveillance footage of [D.P.'s] apartment that showed [Appellant] entering her home at approximately 4:00 a.m. on November 8, 2014; sample Q2 of the DNA evidence buttressed [D.P.'s] testimony that she awoke to [Appellant] licking her neck. Detective Buswell's testimony noted that [Appellant] still had an erect penis at the time of his arrest, a physical state consistent with a man interrupted at the beginning of sexual intercourse.

Trial Court Opinion, filed 12/5/19, at 28-29.

We agree with the trial court's sound reasoning and conclude the evidence, when viewed in the light most favorable to the Commonwealth, as

- 11 -

verdict winner, was sufficient to enable the jury to find every element of the crimes beyond a reasonable doubt. *See Graham*, *supra*.

To the extent Appellant avers D.P.'s testimony was so unreliable and contradictory that the entire verdict is based on no more than surmise or conjecture, we find Appellant is not entitled to relief.

It is well-settled that "[a]n argument regarding the credibility of a witness's testimony goes to the weight of the evidence, not the sufficiency of the evidence." *Commonwealth v. Melvin*, 103 A.3d 1, 43 (Pa.Super. 2014). Nevertheless, in *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993), our Supreme Court observed the following with respect to testimony and sufficiency of the evidence:

> Normally, the evidence is deemed to be sufficient where there is testimony offered to establish each material element of the crime charged and to prove commission of the offense by the accused beyond a reasonable doubt. The question of credibility is left to the [finder of fact] and the verdict will not be disturbed if the [finder of fact] determines the evidence is worthy of belief.
>
> We have, however, made exception to the general rule that the [finder of fact] is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture.

*Karkaria*, *supra*, 625 A.2d at 1170.

In the case *sub judice*, contrary to Appellant's contention, we do not agree that the verdict was based on conjecture or that the victim's testimony was so inherently unreliable as to render the verdict unsupportable. Appellant suggests that D.P.'s version of events is wholly unreliable because she

permitted him to stay at her home on one prior occasion, and T.K. testified he usually locked the front door to D.P.'s apartment, thus suggesting that D.P. unlocked it on November 8, 2014, so that Appellant could gain access after T.K. left for work.  **See** Appellant's Brief at 33-34.

We conclude the jury was free to weigh these facts in determining D.P.'s credibility.  This is not a case, such as **Karkaria**, in which the Commonwealth's case was based upon the testimony of a witness whose credibility was so inconsistent as to be completely irreconcilable, and the finder of fact would have had to guess which version of the story to believe.

Further, contrary to Appellant's suggestion, the holding of **Karkaria** does not require that any case involving allegedly contradictory or inconsistent testimony warrants consideration (let alone reversal) on sufficiency grounds. Simply put, the evidence in this case was not so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at a verdict based on that evidence.[5]

_____

[5] We note that, in developing his sufficiency of the evidence claim, Appellant cites extensively to the testimony presented by his DNA expert, Dr. Girard, and concludes Dr. Girard's testimony called into doubt whether the DNA evidence supported D.P.'s testimony. **See** Appellant's Brief at 35-40. However, even if Appellant's argument is accurate in this regard, as indicated above, the jury was free to weigh this testimony and believe all, part, or none of Dr. Girard's testimony.  Simply put, the evidence is not rendered insufficient because the jury rejected some or all portions of Dr. Girard's testimony. **See** **Melvin**, **supra**.

Further, as it pertains to Appellant's sufficiency of the evidence claim, Appellant contends the jury's verdict convicting him of the three sex-based crimes is inconsistent with the jury's verdict acquitting him on the charge of burglary of an overnight accommodation with a person present under 18 Pa.C.S.A. § 3502(a)(1). **See** Appellant's Brief at 23-24. Appellant posits that the inconsistent guilty verdicts cannot stand since "[i]f Appellant did not unlawfully enter [D.P.'s] apartment on the evening of November 8, 2014, and with no intent to commit a crime, how then can we know for sure what transpired therein on the evening in question between Appellant and [D.P.] beyond a reasonable doubt?" **Id.** at 25. Appellant's issue presents a question of law, to which we apply a *de novo* standard of review. **Commonwealth v. Moore**, 628 Pa. 103, 103 A.3d 1240, 1244 (2014).

"[A] defendant may not challenge his conviction on one count when it is inconsistent with the jury's verdict of acquittal on another count." **Moore**, *supra*, 103 A.3d at 1246. This is because, in such a case, although a jury conviction establishes that the jury found each element of a crime beyond a reasonable doubt, no such factual inference can be made by a jury's acquittal. **See id.** (affirming conviction of possessing instrument of crime despite jury's acquittal of murder following self-defense claim).

Thus, in the case *sub judice*, we cannot infer from the jury's acquittal on the charge of burglary of an overnight accommodation with a person present that the evidence at Appellant's trial failed to meet any element of

that offense, or allow such an inference to undermine the jury's conclusion that the evidence **did** meet each element of rape of an unconscious victim, sexual assault, or indecent assault of an unconscious victim.[6] Thus, we find no merit to this claim.

In his final claim, Appellant contends the jury's verdict is against the weight of the evidence. Specifically, Appellant avers the conflicts in the DNA evidence presented by the Commonwealth's expert and Appellant's expert, particularly when weighed against the "incredulous testimony" of D.P., renders the jury's verdict against the weight of the evidence.[7] **See** Appellant's Brief at 48.

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." **Commonwealth v. Talbert**, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. **Commonwealth v. Hopkins**, 747 A.2d 910,

---

[6] As indicated *supra*, the evidence was sufficient to sustain Appellant's convictions for rape of an unconscious victim, sexual assault, and indecent assault of an unconscious victim.

[7] Appellant adequately preserved his weight claim in the lower court. **See** Pa.R.Crim.P. 607.

- 15 -

917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. **Talbert**, **supra**.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. **See id.**

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Id.** at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Id.** (quotation marks and quotation omitted).

Here, in rejecting Appellant's weight of the evidence claim, the trial court relevantly indicated:

> [I]t is readily apparent to this Court that the jury's verdict was not against the weight of the evidence. The Court had the opportunity to hear the same evidence as the jury,…such as the eyewitness testimony of [D.P.], [T.K.], Detective Hallowich, and [Detective] Buswell, the surveillance footage from the night of November 8, 2014, and the expert testimony of Garafalo and her DNA analysis report, [as well as Dr. Girard's] testimony. The Commonwealth presented a thorough case against [Appellant] and provided the jury with plenty of material to sift through and weigh, which the jury did in reaching its verdict. For these reasons, when balancing

- 16 -

the totality of the trial evidence against [Appellant's] conviction, the Court concludes that our sense of justice was not shocked by this verdict and that a new trial was, and still is, unnecessary.

Trial Court Opinion, filed 12/5/19, at 26.

We conclude the trial court did not abuse its discretion in denying Appellant's challenge to the weight of the evidence. *Talbert*, *supra*. We note the jury was free to determine the weight and inferences to be drawn from the DNA experts' testimony, as well as D.P.'s testimony. To the extent Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, we decline to do so as it is a task that is beyond our scope of review. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact").

For all of the foregoing reasons, we affirm.

Affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/27/2020

- 17 -