J-A29018-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PHILLIP MICHAEL HAUN JR. | : | |
| | : | |
| Appellant | : | No. 1363 WDA 2023 |
| . | : | |

Appeal from the Judgment of Sentence Entered October 4, 2023
In the Court of Common Pleas of McKean County Criminal Division at
No(s): CP-42-CR-0000112-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| PHILLIP M. HAUN, JR. | : | |
| | : | |
| Appellant | : | No. 1368 WDA 2023 |

Appeal from the Judgment of Sentence Entered October 4, 2023
In the Court of Common Pleas of McKean County Criminal Division at
No(s): CP-42-CR-0000113-2022

BEFORE: OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.: **FILED: May 20, 2025**

Phillip Michael Haun, Jr. ("Haun"), appeals from the judgment of

sentence imposed following his jury convictions for two counts of endangering

the welfare of a child ("EWOC") and one count each of terroristic threats, simple assault, and resisting arrest.[1]  After careful review, we affirm.

Haun was the primary caretaker for his nine-year-old son ("the Child"), who has autism.  In January 2022, the Child told his school counselor, Kim Alfieri ("Alfieri") that Haun had physically abused him, including shoving and hitting him, choking him in front of Haun's girlfriend, Christina Baker ("Baker"), pointing guns at him, and threatening to kill him and stab him with a knife.  The Child told Tanner Danielson ("Danielson"), a caseworker for Children and Youth Services ("CYS") that Haun had recently pointed a gun at him sometime after school because the Child had accidentally broken his own glasses.  The Child said that Haun had also threatened him with a gun the previous summer.  The Child described both guns to Danielson.

Later that month, the Child participated in a forensic interview with Mikele Bay ("Bay"), the executive director of the McKean County Children's Advocacy Center ("CAC").  Child stated that Haun became angry about the Child's broken glasses, pushed him into a corner, choked him and threatened him with a gun.  He also described an incident when he was eight and Haun placed a gun against his back and threatened him because he got up to get a drink in the middle of the night.  This interview was video-recorded and transcribed.

---

[1] **See** 18 Pa.C.S.A. §§ 4304(a)(1), 2706(a)(1), 2701(a)(3), 5104.

Trooper Neil Ginther ("Trooper Ginther") of the Pennsylvania State Police ("PSP"), investigated the case. He obtained a search warrant to search Haun's residence for the firearms the Child described and seized two firearms matching the descriptions. He then obtained a warrant for Haun's arrest. Trooper Ginther and other members of the PSP went to the residence to serve the warrants. A child inside the residence yelled "police are here!" N.T., (Jury Trial - Day Two), 8/2/23, at 44. Haun came out to the exterior porch, where the officers explained they had an arrest warrant for him. Haun attempted to resist arrest, and officers were able to take him to the ground where he continued to conceal his hands and flail his legs.

In a complaint filed on January 21, 2022, Trooper Ginther charged Haun at two separate dockets with, *inter alia*, EWOC, strangulation, terroristic threats, simple assault and resisting arrest. The trial court initially scheduled a preliminary hearing for February 7, 2022. However, Haun requested a continuance, and the trial court rescheduled the preliminary hearing to February 22, 2022. On February 22, 2022, Haun again requested a continuance, and the trial court rescheduled it to March 7, 2022. Following the preliminary hearing on March 7, 2022, the trial court held Haun for trial on all charges.

The trial court then assigned Haun's case to the Honorable John Pavlock ("Judge Pavlock") for trial. On March 11, 2022, Judge Pavlock, the only criminal division judge in McKean County, entered an order recusing himself

from this case. The court entered an order setting Haun's "last day to plea,"[2] and assigned the matter to the Honorable Christopher Hauser ("Judge Hauser"), McKean County's only other judge.

On March 21, 2022, the Commonwealth filed an information in this matter, and on April 28, 2022, filed a notice of joinder that it would try both of Haun's cases together. In response to a defense request for a continuance, the court rescheduled Haun's last day to plea from May 12, 2022, to May 27, 2022. Haun sought another continuance of the plea date on May 23, 2022, and the court rescheduled it to June 24, 2022. On June 27, 2022, the court placed Haun's case on its trial list.

On July 22, 2022, the Commonwealth filed a motion for a Tender Years Hearsay Act[3] hearing. The court held a hearing on September 27, 2022, and

_____

[2] At the hearing on the Pa.R.Crim.P. 600 motion, the office manager for the McKean County District Attorney's Office testified that, in McKean County, the court assigns a defendant a last day to plea; on that date, the defendant must enter a guilty plea, list the case for trial, or request a continuance. *See* N.T., (Motion to Dismiss Hearing), 7/12/23, at 6-7, 22, 44. The court assigns the last day to plea when the preliminary hearing is held or waived. *See id*.

[3] *See* 42 Pa.C.S.A. § 5985.1(a)(1)(i)-(ii) (providing that an out-of-court statement, made by a child victim or witness when they were sixteen years of age or younger, describing an offense enumerated in paragraph (2), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if: (i) the court finds, in an *in camera* hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and (ii) the child either testifies at the proceeding or is unavailable as a witness).

subsequently ruled that certain hearsay testimony was admissible at trial.[4] On November 9, 2022, the court docketed an order by Judge Hauser recusing himself from the proceedings.

On November 16, 2022, the Commonwealth filed a motion seeking a date for a criminal jury trial and requesting the assignment of a visiting judge, due to the recusals of Judge Pavlock and Judge Hauser. It was not until January 9, 2023 that the court assigned a visiting judge, who that same day entered an order scheduling a status conference for January 19, 2023. At this status conference, the Commonwealth stated that it was prepared to proceed to trial.[5] However, Haun indicated that he would file a motion to sever the cases. While the court was prepared to select trial dates in March or April, it did not because Haun stated that he would file a motion to sever. The Commonwealth objected, stating that Haun waited more than a year after the Commonwealth joined his cases to file the motion. The court then directed Haun to file the motion within seven days, and he filed it on January 26, 2023.

_____

[4] At the hearing, the trial court interviewed the Child *in camera* with counsel present. On October 31, 2022, Judge Hauser issued an opinion and order, permitting at trial: (1) testimony regarding hearsay statements the Child made to CYS caseworker Danielson and forensic interviewer Bay ; (2) the Child's testimony through a contemporaneous alternative method outside of Haun's presence in the courtroom; and (3) the video and transcript of the forensic interview ("CAC interview") Bay conducted of the Child.

[5] We note that Haun did not provide transcripts from the January 19, 2023 status conference hearing as a part of the certified record. However, the parties do not dispute what transpired at the hearing; therefore, the lack of the transcript does not hamper our review.

On February 23, 2023, the Commonwealth filed a second motion seeking a date for a criminal jury trial. The court scheduled a hearing on Haun's motion to sever for April 12, 2023, which the court denied by order dated April 14, 2023. Subsequently, the court entered an order that jury selection and trial would commence on August 1, 2023.

On June 8, 2023, after the trial court issued its trial scheduling order, Haun filed a Pa.R.Crim.P. 600(A) motion to dismiss the charges with prejudice, asserting that the Commonwealth did not bring him to trial within 365 days of the filing of the criminal complaint. *See* Pa.R.Crim.P. 600(A)(2)(a). The court entered an order scheduling a hearing for Haun's Rule 600 motion for July 12, 2023.

The trial court held the hearing on July 12, 2023, during which the Commonwealth presented exhibits and two witnesses — Frances Carner, the office manager for the McKean County District Attorney's Office, and Patricia Brown, the McKean County Court Administrator. Both witnesses testified that the court automatically assigns all criminal cases to Judge Pavlock, the president judge in McKean County. The court also provides the Commonwealth with a list of available dates from Judge Pavlock's calendar and allows the Commonwealth sole discretion in scheduling matters before him for trial. However, in Haun's case, Judge Pavlock recused himself and the court assigned Haun's case to Judge Hauser, who is the county's second judge. In this instance, Judge Hauser also recused himself. The court does not

provide the Commonwealth with the ability to schedule Judge Hauser's trials; rather court administration schedules these trials. Additionally, the Commonwealth does not have the ability to schedule trials with visiting judges, such as the one assigned to Haun's case after Judge Hauser recused himself. Furthermore, there is an order in McKean County that requires the court to give the defense at least thirty days' notice for jury trials. *See* N.T., (Haun's Motion to Dismiss Hearing), 7/12/23, at 18.

Haun argued that: (1) the only delays attributable to him were defense continuances from February, 7, 2022 to March 7, 2022 (preliminary hearing), and from May 12, 2022 to June 24, 2022 (last day to plea); (2) other delays, caused by the recusals of the two judges, and his January 26, 2023 filing of the motion to sever, should not be considered as defense delays; and (3) considering all of the time in which the Commonwealth failed to bring him to trial, the Commonwealth failed to exercise due diligence in this matter. *See id*. at 29-30.

The Commonwealth responded: (1) Haun caused significant delays by continuing the preliminary hearing from February 7, 2022 to March 7, 2022, and the last day to plea day from May 12, 2022 to June 24, 2022; (2) it cannot schedule trials when there is a recusal judge or visiting judge; (3) the Commonwealth twice filed motions — on November 16, 2022 and February 23, 2023 — seeking trial dates for the case; (4) after the two local judges recused and a new judge was assigned, Haun continued the January 19, 2023

status conference to file a motion to sever, and thus delayed the scheduling of the trial until the motion was heard on April 12, 2023; (5) another thirty-five days of defense delay passed between Haun's June 8, 2023 filing of his Rule 600 motion and the July 12, 2023 hearing ; (6) the visiting judge's first date available to hold a jury trial was August 1, 2023; and (7) at all times the Commonwealth exercised due diligence, was prepared to try the cases, and gave Haun notice of its intent to try the cases together. *See* N.T., 7/12/23, at 30-35.

The trial court denied Haun's Rule 600 motion to dismiss. Thereafter, Haun's jury trial commenced on August 1, 2023. At trial, the Commonwealth presented several witnesses including: (1) Alfieri, the Child's school counselor; (2) Danielson, the CYS caseworker; (3) Bay, the CAC forensic interviewer; (4) the Child; and (5) members of the PSP. We summarize in detail the following evidence.

Alfieri testified to the following. In January 2022, the Child's teacher noticed he was having a "hard time refocusing in the classroom." N.T., (Jury Trial - Day One), 8/1/23, at 16-17. Alfieri brought the Child to her office, where he told her that Haun had pushed him into a corner and choked him after he broke his glasses. *See id*. The Child was "visibly agitated," and Alfieri noticed a cut on his jawline, which the Child stated came from Haun's "claws" when he pushed him into the corner. *Id*. at 20-22. The following day, the Child came to Alfieri's office again, this time showing her two bruises on his

leg. **See id**. at 23. The Child asked Alfieri if he could go home with his classmates because he was afraid to go home with Haun. **See id**. at 26. Alfieri promptly contacted CYS. **See id**. at 26-27. Danielson came to the school to interview the Child. During the interview, the Child appeared to have flashbacks reliving the moment — "[h]is eyes would get a little glossy and it was as if, you know, he wasn't making eye contact[. . . . He was v]ery agitated." **Id**. at 27.

Danielson testified to the following. He interviewed the Child at his school on January 21, 2022. **See** N.T., 8/2/23, at 7-8. The Child told Danielson that he accidentally stepped on his own glasses and broke them. Haun became angry about it, grabbed him by the throat, and pushed him into a corner. **See id**. at 8. Danielson noticed a scratch on the right side of the Child's face and took a photograph of it. **See id**. The Child demonstrated how Haun had grabbed his throat with two hands, making him feel like "he had to breathe deep." **Id**. at 8-9. As the Child described the incident to Danielson, he became visibly upset and "started stimming, which is a way he self-soothes. [H]e was rocking back and forth. . . . He said [Haun] was a demon[, who] gets demon-like, he gets scary[,] almost every day of the week." **Id**. at 9.

When Danielson asked the Child if Haun ever told him to keep a secret, the Child stated that "on Wednesday, the day of the incident, [Haun] told him to keep a secret, and that if anyone came and talked to [him], don't tell them

anything." *Id*. at 10. Danielson then asked the Child to tell him where Haun's girlfriend, Baker, was during the incident and he said she was sitting on the edge of the bed and did not help him when Haun "put a gun to him and said, I will fucking kill you." *Id*. When asked to describe the gun, the Child said it was a pistol with a "brown handle and a black top." *Id*. The Child then told Danielson that on another occasion he heard Haun threaten to kill Baker and her daughter. *See id*.

The Child also told Danielson that the previous summer, he got out of bed in the middle of the night to get water and Haun placed an "all black pistol" to his back and said, "go back to bed or I'll kill you." N.T., 8/2/23, at 11. When Danielson asked the Child if "he felt like [Haun] would kill him. [The Child] said, yes, [Haun] had killed family dogs in front of him before, and that [Haun] had threatened to kill anyone that came to take away [his] children from him." *Id*. The Child then talked about an incident when Haun threatened to stab him with a knife, but did not give much detail about it, and "was starting to shut down, [so Danielson] didn't want to push that any further." *Id*.

Danielson asked the Child how he felt at home. The Child "went over to the emotion pillows that [Alfieri] had in the classroom. He pulled out scared, sad, and frightened and angry, and said this is how he feels." *Id*. Alfieri had previously shared with Danielson that the Child had been asking classmates if he could spend the night with them. *See id*. Danielson asked the Child why,

and the Child said "he was afraid to go home [because] he was fearful [that Haun] would actually kill him, and that [Haun] does not want him." ***Id***. Before concluding the interview, Danielson asked the Child if he had any questions, and the Child "asked if someone could come check on him every day just to make sure he is not dead." ***Id***. at 12.

On cross-examination, Danielson corroborated that the Child described one pistol — with a brown handle and black top — which Haun pointed to his head in the incident where he put his hands on the Child's throat and threatened to kill him. ***See*** N.T., 8/1/23, at 13. On redirect, Danielson confirmed that the Child also described a second pistol — with a black handle and black top — from the previous summer's incident when he got up at night to get a drink. ***See id***. at 15.

Bay testified that she was alone when she conducted a fifty-five-minute, videotaped forensic interview with the Child at the CAC on January 26, 2022, when he was nine. ***See*** N.T., Jury Trial, 8/1/23, at 91, 94, 96. During Bay's testimony, the Commonwealth played the recording of the Child's CAC interview and presented a transcript of it. ***See id***. at 93-94, 97. The Commonwealth then showed Bay a picture that the Child drew of his family during the CAC interview, which showed demons and an illustration of Haun with his hand shaped like a gun. ***See id***. 49, 51, 97.

The video showed that during the CAC interview, the Child disclosed information to Bay while she asked him open-ended questions. ***See*** N.T.,

(Interview of the Child), 1/26/22, at 2-41. The Child recalled in detail two incidents when Haun threatened him with a gun. *Id*. at 18-29. First, the Child recalled when he "was eight," he got out of bed at night to "get a drink [when Haun] just hit [him] with a gun on [his] back [saying g]et into bed now [or] I will kill you." *Id*. at 21-24. Second, the Child recalled that when he was "nine," Haun became angry over the Child's broken glasses, "tried to choke [him] out[,] pulled a gun out on [his] head[,]" and scratched his neck with his "claws." *Id*. at 13, 16, 18, 24, 26. The Child described the guns. *Id*. at 36. He told Bay that Haun had "demons on his back" and drew a picture of Haun and a demon. *Id*. at 23.

The Commonwealth also asked Bay about the video. *See* N.T., 8/1/23, at 97. Bay corroborated that during the CAC interview, the Child recounted two incidents of abuse, one of which occurred when he was eight, and one when he was nine. *See id*. at 91-92. He told her that Haun pointed guns at him during the incidents and "had his finger on the trigger on both occasions; and that he was scared that [Haun] would kill him." *Id*. at 93.

Bay also corroborated that during the interview, the Child told her that Haun had demons on his back, had claws like demons, and needed to get the demons off his back. *See id*. at 94. He told her that he felt like he needed to call 911, but then "911" showed up. *Id*. at 99. The Child told her that when he saw the police had arrived, he told Haun "don't go out there. I told

him the cop is out there, but he just go out there anyway. He's dumb." *Id*. at 100.

The Child, who was eleven years old and in sixth grade at the time of the trial, testified *via* closed-circuit television, out of Haun's presence. *See* N.T., 8/1/23, at 34-35, 37. He lived with Haun before CYS placed him in foster care. *See id*. at 38. The Child testified that he was living in foster care because "[Haun] pulled like a gun to [his] head" and "like held [his] throat. Pushed [him] in a wall. Like put a gun to [his] head." *Id*. at 38. When asked to describe to the jury what Haun did to his throat, the Child said "like hold it." *Id*. at 40. The Child testified that Haun "used two hands. He [] got his [g]lock in his pants. . . . He [] didn't pull it out yet. He was holding my throat, and then holding the gun." *Id* at 41. When asked how it felt, the Child said it felt "like I can't breathe air." *Id*. The Child explained that he knew Haun was upset at the time because he "saw his face" and Haun said "[t]hat he's angry. . . . He's pissed off." *Id*. at 42. Soon after this happened, he told his teacher, Alfieri, and Danielson. *See id*. at 39-40.

After telling Alfieri and Danielson what happened, "[Haun] got arrested [that] night[,]" and the Child no longer lived with him. *Id*. at 44. The Commonwealth asked the Child to tell the jury about Haun. *See id*. at 46. The Child answered, "[H]e's an angry guy. He always wants to be mean." *Id*. The Child stated that Haun would call him names like "son of a . . . bitch." *Id*

at 48. He further recalled witnessing Haun tell Baker that he would put her in a body bag. *See id*. at 49.

During the Child's testimony, the Commonwealth showed him the picture he drew of his family during his CAC interview with Bay. *See* N.T., 8/1/23, at 51. The Child explained that he drew demons because Haun "holds all of the demons." *Id*. at 51. And Haun "was yelling at the teachers at the school. He said, I'll bring all my demons there." *Id*. at 52. When asked what Haun meant, the Child answered "[h]e'll bring all his power." *Id*.

The Commonwealth then asked the Child what happened to the guns he told Alfieri and Danielson about that Haun had pointed at him, and the Child said that "the cops took it" and "[p]ut it into their place." *Id*. at 52. The Child explained that when the police found Haun's guns, they confiscated "all of it." *Id*.

The Child recalled for the jury two additional frightening incidents that he witnessed when he was "ten," in which Haun: (1) shot the family dog in front of him; and (2) threatened to choke the pizza delivery person. *Id*. at 55-57. He told Alfieri about these incidents. *See id*. at 57. The Child explained that he asked Danielson and Alfieri to check on him because Haun "always trying to be mean to me. . . . I didn't want [Haun] to try and hurt me." *Id*. at 58. When the Child informed Haun that he told Alfieri what Haun had done to him, Haun "got mad about it." *Id*. Previously, Haun had instructed the Child not to say anything. *See id*. at 58. The Child admitted

that when Haun said "don't tell no one about this[,] he lied to Haun, as he did not want anyone to know "he pulled a gun into" him. *Id*. at 59.

On cross-examination, Haun's counsel questioned the Child extensively about the incidents of abuse by Haun, focusing on: (1) the Child's recollection of the details he told his teacher, Alfieri, Danielson, and Bay about when Haun held a gun to him and threatened to kill him; (2) the Child's description of the guns, including the specific color of each one; (3) who else was present when Haun choked him and pointed a gun at him; (4) the specific wording of Haun's threats; (5) what Haun would say to him when he was angry; and (6) whether the Child's face was scratched by the puppy instead of Haun. *See* N.T., 8/1/23, at 60-73. Haun's counsel also played the Child's videotaped CAC interview and asked whether he told Bay that Haun pointed an A49 at him, in the following exchange:

[Haun's counsel: Do] you remember saying anything to [Bay] the [CAC worker] about [Haun] pointing an A49 at you?

[The Child:] Yes.

[Q.] All right. What's an A49?

[A.] I don't know. It's just a pistol.

N.T., 8/1/23, at 70.

Thereafter, on redirect, the Commonwealth asked the Child to explain why he called one of the guns an "A49," and the Child answered "because [Haun said] it's a 49[, but i]t's a short gun." *Id*. at 74. The Child testified that it was not a rifle, but, "[i]t's a pistol." *Id*. The Child then explained that

- 15 -

he told Bay that the gun Haun pointed at him had a trigger with the "[s]afety on/off safety [*sic*]." *Id*. at 76. The Child further stated that Baker was present when Haun choked him and threatened him with a gun. *See id*. at 74.

Trooper Ginther described his involvement with the case. *See* N.T., Jury Trial, 8/2/23, at 30, 39. CYS had contacted PSP requesting assistance "to remove a kid from home," and that Haun threatened to shoot CYS caseworkers during the removal process. *Id*. at 30. Trooper Ginther received information from Danielson that Haun had two pistols, one all black and one "tan with a black top." *Id*. at 15, 34. Trooper Ginther obtained an arrest warrant, and a search warrant based on the information the Child reported to Danielson. *See id*. at 39-40. Trooper Ginther went to Haun's residence, together with other members of the PSP, and recovered two pistols matching the Child's description from Haun's bedroom, which the Commonwealth entered as evidence at trial. *See id*. at 44, 53-55.

The defense presented several witnesses at trial, including Baker and Haun who testified on his own behalf. Baker testified that she lived with Haun and never once witnessed him behave in a physically violent or assaultive manner toward the Child. *See* N.T., 8/2/23, at 69, 71- 72. Baker maintained that when the Child broke his glasses, Haun merely told him that he should not break important things out of anger and replaced the glasses without incident. *See id*. at 72. She stated she witnessed Haun's puppy scratch the

Child's face, not Haun. *See id*. at 74. She claimed that Haun never told her that he would put her in a body bag. *See id*.

Haun testified that the Child required services and medication because of his attention deficit hyperactivity disorder ("ADHD") and autism. *See id*. at 122. However, he did not present any medical documentation or other corroborative evidence. *See id*. He testified that the Child had a reputation for dishonesty. *See id*. at 125. He described the incident when the Child broke his glasses:

> [The Child] come running into the room saying that [his sister] broke his glasses. I had enough of the lying, so I told him to get in the corner for lying and breaking his glasses. He said he didn't want to. I told him, get in — get in the corner, and I maneuvered him around and I applied him into the corner. I did not shove, I did not push, I didn't do any of that[.]

*Id*. at 126. He denied threatening to kill the Child or pointing a gun at him. *See id*. at 127, 129.

Haun also testified that he did not possess the pistols until at least September 2021, when he took them from his deceased father's safe. *See id.* at 128. He testified that the Child was likely to have seen those pistols on several occasions: (1) when the Child previously stayed at his grandfather's house every weekend and sometimes weeks at a time; (2) when Haun cleaned the guns; and (3) when the guns were fired in a makeshift twenty-one-gun salute in honor of Haun's late father. *See id*. at 128-29. Haun maintained that the Child's reference to him possessing an A49 gun was probably due to

the Child's familiarity with video games Haun played containing fictitious weapons. *See id*. at 130-31.

Haun claimed that the Child's reference to him having demons was most likely because the Child heard him say "stuff like that when [he] was talking to [his] therapist [during his] therapy sessions with [his] therapist . . . over video or on the phone." *See id*. at 131-32. He denied using profanity towards the Child but conceded that he "swear[s] like a sailor." *Id*. at 133.

Haun denied choking the Child. *See id*. He also denied scratching the Child's face, claiming that a new puppy, obtained two days before Christmas in 2021, caused the injury. *See* N.T., Jury Trial, 8/2/23, at 134. He suggested that Alfieri's observation a month later, in January 2022, that the wound on the Child's face appeared fresh, was most likely due to the Child's ADHD and autism, which caused him to "scratch himself and dig all of his scabs and everything open again." *Id*. at 159. Regarding Alfieri's observations of the bruises on the Child's legs, Haun stated that he "[c]ouldn't tell you where he got them from[.]" *Id*. He denied that he: (1) threatened the pizza delivery person in front of the Child; (2) threatened to stab the Child with a knife; or (3) threatened to kill the CYS caseworker. *See id*. at 135, 146.

The Commonwealth presented several rebuttal witnesses, including the Child's school bus driver, Penny Mackey ("Mackey"). She testified that two years prior to the trial, she observed "a red mark on the side of his face that you could see the fingerprints." *Id*. at 166-67. When Mackey asked the Child

about the marks, he said that Haun got angry at him for spilling some milk.
*See id*.

Following a two-day trial, a jury convicted Haun of two counts of EWOC, one count of terroristic threats, one count of simple assault by physical menace, and one count of resisting arrest. The jury acquitted Haun of strangulation. On October 4, 2023, the trial court sentenced Haun to an aggregate term of twenty-seven to seventy-two months' incarceration, followed by twenty-four months' probation to run concurrently.

Haun filed a timely post-sentence motion, arguing that the verdicts were contrary to the weight of the evidence, which the trial court denied. Haun then filed a timely notice of appeal. Haun did not file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal until May 23, 2024, after this Court granted his *nunc pro tunc* application for relief. Thereafter, Haun complied with Pa.R.A.P. 1925.The trial court filed a two-sentence Rule 1925(a) statement, incorporating the record but it did not address Haun's issues raised on appeal.[6]

Haun raises the following issues for our review:

1. Was the evidence at trial qualitatively insufficient to support Haun's conviction for [EWOC] because the Commonwealth

---

[6] Rule 1925(a) requires that "upon receipt of the notice of appeal, the judge, . . ., if the reasons for the order do not already appear of record, shall within the period set forth in Pa.R.A.P. 1931(a)(1) file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or shall specify in writing the place in the record where such reasons may be found." Pa.R.A.P. 1925(a).

failed to demonstrate that Haun violated any duty of care, protection or support?

2. Was the evidence at trial qualitatively insufficient to support Haun's conviction for terroristic threats because the Commonwealth failed to prove that Haun threatened to commit a crime of violence?

3. Was the evidence at trial qualitatively insufficient to support Haun's conviction for simple assault by physical menace?

4. Did the trial court abuse its discretion in denying Haun's Rule 600 Motion to dismiss?

Haun's Brief at 5.

In Haun's first three claims, which we review together, he challenges the sufficiency of the evidence for his convictions for EWOC, terroristic threats and simple assault by physical menace. When reviewing a sufficiency challenge,

> we evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient . . . when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. . . .
>
> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. . . .

[The fact finder] passes upon the weight and credibility of each witness's testimony, [and] is free to believe all, part, or none of the evidence.

***Commonwealth v. Sebolka***, 205 A.3d 329, 336-37 (Pa. Super. 2019)

(citations and quotation marks omitted).

Generally, challenges to the verdict based on inconsistent testimony implicate the weight, not the sufficiency, of the evidence. *See* ***Commonwealth v. Smith***, 181 A.3d 1168, 1186 (Pa. Super. 2018). However, our Supreme Court has recognized "an exception to the general rule that the jury is the sole arbiter of the facts where the testimony is so inherently unreliable that a verdict based upon it could amount to no more than surmise or conjecture." ***Commonwealth v. Karkaria***, 625 A.2d 1167, 1170 (Pa. 1993) (citation omitted).

In ***Karkaria***, the Commonwealth charged the defendant, sixteen years old, with forcible rape, allegedly committed against his stepsister, age eight, between April 9, 1984, and September 19, 1984. *See id*.at 1167. At trial, "the Commonwealth presented no physical evidence." *Id*.at 1169. The complainant's "testimony as to when any particular act of rape occurred [was] disturbingly vague." *Id*. at 1171. She testified that the assaults "occurred on a regular weekly basis for over three years . . . in exactly the same manner," when the defendant babysat her. *Id*. at 1168. The complainant further stated that although her other brother was present, "he was never aware of what was transpiring." *Id*. at 1168. The complainant "initially insisted that the assaults only occurred on Friday or Saturday evenings," when her parents went out. *Id*. at 1171. She also maintained that another stepbrother was never in the home when the assaults occurred. *Id*.

> However, when confronted with her own testimony that [the other
> brother] was in her home every other weekend from Friday

> evening to Sunday evening[,] and that on the alternate weekends [the defendant] was not in the home, she testified that the assaults occurred at another time. However she failed to specify when that particular opportunity arose. . . .

*Id*. Furthermore, the complainant "insisted that the assaults only occurred when [the defendant] was babysitting and yet she also admitted that during the time period charged in the indictment (April through September 1984), [the defendant] no longer acted as the babysitter." *Id*. at 1171.

However, the complainant could not recall that the defendant penetrated her[7] — an element of rape — or specify when or how the assaults may have occurred. *Id*. at 1171. The complainant also testified that she never experienced pain during the incidents, cried out, complained to anyone about the abuse, or objected to being left in the defendant's care. *Karkaria*, 625 A.2d at 1168, 1170.

The defendant testified on his behalf, denying all the allegations. *See id*. at 1168. The jury found him guilty of forcible rape. *See id*. On appeal, the defendant argued "there was insufficient evidence . . . from which the jury could conclude beyond a reasonable doubt that any single act of rape occurred during the time period charged in the indictment. Essentially, [the defendant] assert[ed] that the testimony presented to the jury was so unreliable and

---

[7] The complainant's testimony did "describe[] one specific act of intercourse which she state[d] occurred in 1981," three years before the dates alleged in the indictment. *Karkaria*, 625 A.2d at 1171.

contradictory that [its] verdict could only have been arrived at through speculation and conjecture." *Id*. at 1170.

Upon reviewing the case on appeal, our Supreme Court agreed,

In order for the jury in this case to have concluded that [the complainant] was forcibly raped by [the defendant], the jury would have had to conclude that the child had been forced to submit to sexual intercourse at least once between April 9, 1984 and September 19, 1984. Since there was no direct evidence of sexual intercourse between those dates, the jury in order to convict, would have had to conclude, beyond a reasonable doubt, that the [complainant] had been forced to submit to sexual intercourse over 300 times, without ever feeling pain, without any physical evidence to support the contention that she was so victimized, and without any specific recollection by [the complainant] as to a date certain upon which even one of the several hundred assaults occurred.

*Id*. at 1170-71.

The Court further noted that the complainant "corroborate[d the defendant's] testimony that not only was he no longer the babysitter in 1984, but that he was rarely even in the family home during that time period." *Id*. at 1171. The Court further reasoned: "The lack of evidence as to when the alleged assaults occurred is made even more striking by the fact that [the complainant] offered one scenario, and one scenario only, for each of the 300 or more alleged incidents of sexual assault." *Id*. The Court also pointed out that the initial complaints to law enforcement "coincide[d] precisely with the pending reconciliation of [the complainant's] mother and stepfather" and the complainant had "repeated[ly] express[ed] hatred for her stepfather." *Id*. The Court thus found the evidence was "so unreliable and contradictory" that

it was insufficient as a matter of law to support a conviction of rape committed within the time specified in the indictment.  *Id*. at 1170, 1172.

The Crimes Code defines EWOC, in relevant part, as follows: "A parent, guardian or other person supervising the welfare of a child under 18 years of age . . . commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support."  18 Pa.C.S.A. § 4304(a)(1).

To establish the crime of terroristic threats, the Commonwealth must prove that the defendant made a threat to commit a crime of violence, with the intent to terrorize another.  *See* 18 Pa.C.S.A. § 2706(a)(1); *see also* *Commonwealth v. Kline*, 201 A.3d 1288, 1292 (Pa. Super. 2019) (finding evidence was sufficient to establish that defendant communicated a threat to commit crime of violence with intent to terrorize the victim, with a non-verbal "gesture of a shooting gun recoiling," to support conviction of terroristic threats).

A person commits simple assault under section 2701(a)(3) when he "attempts by physical menace to put another in fear of imminent serious bodily injury."  18 Pa.C.S.A. § 2701(a)(3).  As this Court has explained:

> [T]he act of pointing a gun at another person [can] constitute simple assault as an attempt by physical menace to put another in fear of imminent serious bodily injury. . . . The elements which must be proven are intentionally placing another in fear of imminent serious bodily injury through the use of menacing or frightening activity.  [Furthermore, i]ntent can be proven by circumstantial evidence and may be inferred from the defendant's conduct under the attendant circumstances.

*Commonwealth v. Reynolds*, 835 A.2d 720, 726 (Pa. Super. 2003) (citation omitted).

On appeal, Haun avers the evidence was so vague, unreliable, contradictory and uncreditable as a matter of law to support his convictions for EWOC, terroristic threats and simple assault by physical menace. In support, he relies upon our Supreme Court's decision in *Karkaria*.

First, with respect to EWOC, Haun presents prolix arguments challenging the details of the Commonwealth's witnesses' testimony and citing his own trial testimony to rebut them. *See* Haun's Brief at 26-42. Haun does not contest that he owed a duty of care to the Child as the biological parent tasked with caring for him. Instead, Haun argues that the evidence was "so vague, unreliable, and contradictory so as to be uncreditable as a matter of law, and therefore it failed to show that Haun violated any duty of care, protection, or support." Haun's Brief at 26. Haun contends that the Commonwealth's witnesses, especially the Child, presented inconsistent testimony about the physical abuse.

Specifically, Haun highlights the following inconsistencies. The Child previously told Bay and Danielson that Haun pushed a gun against his back in the "nighttime bathroom incident," but at trial, the Child did not mention any gun, and instead merely testified that Haun told him to go back to bed. Haun's Brief at 29-30. This gun incident allegedly occurred in summer 2021, but the "only testimony at trial" was that Haun did not possess guns until October

2021. *Id*. at 33. Although the Child described the gun in this incident to Danielson as a pistol with a "black handle and black top[,]" at trial, the Child described it as a "green one" and an "A49." *Id*. at 30. According to Haun, the Child's inconsistencies regarding this incident amount to "vague allegations." *Id*. Haun maintains that "the Commonwealth could only elicit hearsay testimony concerning what [the Child] allegedly disclosed [about this incident.]" *Id*. The jury never heard any details from the Child about this incident other than "saying he was not allowed to get out of bed in the middle of the night." *Id*. Haun concludes that the defense testimony discredited both the Child and "the Commonwealth's hearsay testimony concerning this apparent incident." *Id*. at 31.

Haun also emphasizes the following inconsistencies about the incident related to the Child's broken glasses, and restates his previous two arguments that: (1) "[t]he only evidence adduced of a threat in connection to this incident was made outside of court and introduced as hearsay pursuant to the Tender Years Hearsay Act[;]" and (2) "[the Child] did not testify in a manner that corroborated the claims made by other witnesses as to what [the Child] informed them." Haun's Brief at 36. Haun alleges that the Child could not describe the color or type of gun he used during this incident other than it being a "green gun" or an "A49." *Id*. at 36-37. Haun claims that his own testimony offered alternate credible explanations for his possession of guns — such as when he played video games or cleaned them — rather than the

Child's testimony that Haun threatened with them. Haun concludes that the Child's testimony, that he put a gun to his head because he broke his own glasses, "was unclear, unreliable, and contradictory, such that it is insufficient to support a verdict of guilty, and is insufficient as a matter of law." *Id*. at 38.

Another point of contention Haun raises regarding his EWOC convictions is a red scratch mark on the Child's neck, which Alfieri testified the Child informed her Haun caused. Haun argues "the vast majority of the testimony received at trial revealed that this scratch was not caused by Haun," but rather "the result of [the Child] playing with a new puppy named Doc owned by the family." Haun's Brief at 38-39. Haun maintains that the Commonwealth's "evidence equally supported two reasonable but diametrically opposed ultimate inferences." *Id*. at 39. Here Haun concludes that that "the Commonwealth failed to sustain its burden of proof of guilt beyond a reasonable doubt [d]ue to the lack of clarity and the evidence presented of both scenarios[.]" *Id*. at 40.

Haun maintains that the rebuttal testimony from the Child's school bus driver, Mackey, was "similarly vague and speculative[.]" *Id*. at 41. Mackey testified that she noticed the Child with red marks on his face one day when he got on the bus to go to school. At the time, the Child told her that Haun was angry at him for spilling milk. Haun contends Mackey's "hearsay"

testimony about this incident was "too . . . uncreditable to prove that Haun violated any duty of care, support, or protection." *Id*.

Second, in the next nine pages of his brief, Haun claims that the evidence was "so unreliable and contradictory[,] and thus, [was] insufficient as a matter of law[,]" to support his conviction for terroristic threats. Haun's Brief at 42-51. Haun maintains there was no direct evidence of any threats, and the Child was unable to express any threat he made to him. Haun contends that the only evidence that he made threats was "through hearsay testimony from third-party witnesses other than [the Child], who was the apparent target of the threats." *Id*. at 43.

Haun specifically highlights the following inconsistencies. "When Alfieri first began investigating, [the Child] did not describe any threats or use of a weapon, but merely that [Haun] was angry at him for breaking his glasses and that he pushed him into a corner and choked him." *Id*. at 44. When "[the Child] testified [that Haun] pointed a gun at his head, he did not actually say that [Haun] communicated any threats to kill him." *Id*. Instead, the Child "[merely] described [Haun] as 'angry' and 'pissed off,'" but did not detail any threats Haun communicated to him. *Id*. Haun maintains that the Child did not testify at trial "as to any threats made to him during the 'summer nighttime incident.'" Haun's Brief at 45. Haun claims that Danielson's and Bay's testimony also did not corroborate that Haun verbally threatened the Child during any of the incidents.

With respect to the incident involving the breaking of the Child's glasses, Haun argues the following. Haun's Brief at 46- 47. At trial, Alfieri testified the Child told her his sister broke his glasses, the Child testified Haun broke his glasses,[8] but Danielson testified the Child told him that he broke his own glasses. *See* Haun's Brief at 46. This "contradictory" testimony from Alfieri and Danielson "undermine[d] the overall creditability of [the Child's] testimony[.]" *Id*. Baker's testimony "further undermined the creditability of [the Child], Danielson, and Bay's testimony when she reported that when the glasses were broken, Haun handled the situation much more calmly than [the Child] had contradictorily described, and simply informed [the Child] that he should not break important things simply out of anger, and replaced the glasses without incident." *Id*. The inconsistent testimony was not "creditab[le] as a matter of law, such that the jury could not reasonably conclude that threats were made during this alleged dispute concerning [the Child's] glasses." *Id*.

Haun next cites his own trial testimony, that he never threatened to kill the Child when he broke his glasses. *Id.* at 48. Haun asserts that the jury should have believed him rather than the "third-party hearsay" testimony

---

[8] Our review of the record does not support Haun's contention that Alfieri testified that the Child told her that his sister broke his glasses. *See* N.T., 8/1/23, at 17-18.

from Danielson, Ginther, and Bay because, as he again argues, his testimony "undermine[d] the credibility of [the Child.]". *Id*. at 48-50.

Third, Haun argues that there was no "qualitatively sufficient evidence" to support his conviction of simple assault by physical menace. Haun's Brief at 51-57. Haun alleges the evidence was insufficient to show that he physically threatened the Child with a gun during the "glasses incident," just as it was for terroristic threats. Haun contends that even accepting Alfieri and Danielson's hearsay statements, the Child failed to include any details about his use of a weapon when he first reported the alleged abuse to Alfieri. *See id*. at 52. Haun maintains that the Child waited until a day later when Danielson interviewed him to claim that he pointed a gun at him, and at trial, the Child was unable to describe the weapon that he used in the incident. *See id*. at 53.

Haun also contends that "there was wholly inconsistent testimony concerning allegations about an incident during the summer prior to the disclosure." *Id*. at 54. Haun maintains that there were inconsistencies between Bay's, Danielson's, and the Child's testimony about: (1) the Child's description of the gun Haun pointed at him during the incident; and (2) the Child "made no reference to having a gun pointed at him or any threats of any type in connection to this alleged incident, only that [Haun] would make him go back to bed and that he would yell at him." *Id*. at 55.

Haun again challenges the Commonwealth's evidence asserting that: (1) he presented an alternate explanation at trial that Haun did not possess the guns that the Child described "until at least October of 2021[;]" (2) Haun "denied having pointed a gun at his son, and [Baker] stated that no abuse ever occurred while she lived in the home and that [the Child] did not behave abnormally around [Haun], nor did she ever witness Haun choke or hit [the Child[;] and (3) "Haun testified that [the Child] has issues with honesty, and this was underscored by the inconsistencies in [the Child's] accounts of what he claimed Haun did." Haun's Brief at 56. He concludes that based on **Karkaria**, the evidence "[was] so unreliable and contradictory that it [was] incapable of supporting a verdict of guilty, and thus, [was] insufficient as a matter of law." **Id**. at 57.

Following our review of the record and viewing the evidence in the light most favorable to the Commonwealth as the verdict winner, and granting all reasonable inferences drawn therefrom, we conclude that the evidence was sufficient to establish Haun's guilt beyond a reasonable doubt that he committed the offenses of EWOC, terroristic threats, and simple assault by physical menace. **See Sebolka**, 205 A.3d at 336-37. Haun's reliance on **Karkaria** is misplaced. In **Karkaria** the Pennsylvania Supreme Court concluded the jury rendered a verdict based upon "disturbingly vague," unreliable, and contradictory evidence constituting "exceptional circumstances" that failed to establish the elements of the crimes charged.

*Karkaria*, 625 A.2d at 1170-71. Here, the evidence was not so vague and contradictory that it failed to prove Haun's guilt beyond a reasonable doubt. *See Sebolka*, 205 A.3d at 337. Rather, the jury heard the inconsistencies and credited the Child's testimony, which established beyond a reasonable doubt that Haun, the Child's sole parent had a duty to protect him, but instead held a gun to him several times, with his finger on the trigger, and threatened to kill him.

There were some inconsistencies between the Child's accusations in the CAC forensic interview with Bay in January 2022, when he was nine years old, and his trial testimony more than two years later, when he was eleven. However, the Child's trial testimony, as well as the tender years' hearsay testimony of Danielson and Bay, consistently established each element of the crimes charged. The Child described two incidents of abuse : (1) in January 2022, Haun choked him, leaving a mark on his neck, pushed him into a corner, pointed a pistol at him, and threatened to kill him because the Child broke his glasses; and (2) in the summer of 2021, Haun pointed a gun to his back and threatened to kill him if he did not go back to bed after getting up in the middle of the night to get a drink of water. The Child specifically recalled that during both incidents, Haun held a pistol to him with his finger on the trigger, and the Child was terrified that he would kill him. The presence of inconsistencies was not fatal to the Commonwealth's ability to prove beyond a reasonable doubt that Haun committed the crimes. Any inconsistencies in the Child's trial

testimony were properly for the finder of fact. ***See Sebolka***, 205 A.3d at 337.

Furthermore, any variance between the Child's CAC interview, Bay's and Danielson's tender years' hearsay statements, and the Child's trial testimony does not require a different conclusion. As noted previously, the Child's credibility was for the jury, sitting as the fact finder, to resolve and any question of credibility relates to the weight, not sufficiency, of the evidence. ***See Smith***, 181 A.3d at 1186. Additionally, the variances do not bring this case within the purview of ***Kakaria*** because the Child's testimony was not so unreliable that it undermined the validity of the jury's verdict. ***See Kakaria*** 625 A.2d at 1170. Accordingly, we conclude that Haun is not entitled to any relief for his sufficiency of evidence claims.

In his fourth issue, Haun challenges the denial of his Rule 600 motion. Our standard of review is as follows:

> In evaluating Rule 600 issues, our standard of review of a trial court's decision is whether the trial court abused its discretion. Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.
>
> The proper scope of review is limited to the evidence on the record of the Rule 600 evidentiary hearing, and the findings of the trial court. An appellate court must view the facts in the light most favorable to the prevailing party.

Additionally, when considering the trial court's ruling, this Court is not permitted to ignore the dual purpose behind Rule 600. Rule 600 serves two equally important functions: (1) the protection of the accused's speedy trial rights, and (2) the protection of society. In determining whether an accused's right to a speedy trial has been violated, consideration must be given to society's right to effective prosecution of criminal cases, both to restrain those guilty of crime and to deter those contemplating it. However, the administrative mandate of Rule 600 was not designed to insulate the criminally accused from good faith prosecution delayed through no fault of the Commonwealth.

So long as there has been no misconduct on the part of the Commonwealth in an effort to evade the fundamental speedy trial rights of an accused, Rule 600 must be construed in a manner consistent with society's right to punish and deter crime. In considering these matters . . . courts must carefully factor into the ultimate equation not only the prerogatives of the individual accused, but the collective right of the community to vigorous law enforcement as well.

*Commonwealth v. Faison*, 297 A.3d 810, 821 (Pa. Super. 2023) (citation, brackets, and emphasis omitted).

Rule 600 provides that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). Further, "periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence," while "[a]ny other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

The comment to Rule 600 states the following. "If the delay occurred as the result of circumstances beyond the Commonwealth's control and

despite its due diligence, the time is excluded." Pa.R.Crim.P.600, *comment* (*citing Commonwealth v. Browne*, 584 A.2d 902 (Pa. 1990). "Delay in the time for trial that is attributable to the judiciary may be excluded from the computation of time." *Id*. (*citing Commonwealth v. Crowley*, 466 A.2d 1009, 1011 (Pa. 1983)). "When the defendant or the defense has been instrumental in causing the delay, the period of delay will be excluded from computation of time." *Id*. (*citing Commonwealth v. Matis*, 710 A.2d 12 (Pa. 1998); *Commonwealth v. Brightwell*, 406 A.2d 503 (Pa. 1979) (plurality). "For periods of delay that result from the filing and litigation of omnibus pretrial motions for relief or other motions, the mere filing of a pretrial motion does not automatically render defendant unavailable; [the defendant is] only unavailable if delay in commencement of trial is caused by filing pretrial motion." *Id*. (*citing Commonwealth v. Hill*, 736 A.2d 578, 585 (Pa. 1999).

"[T]he Commonwealth is required to demonstrate that it acted with due diligence during a time period before that period can be deemed excludable." *Commonwealth v. Harth*, 252 A.3d 600, 617 (Pa. 2021) (emphasis and footnote omitted). "Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010). Due diligence must be demonstrated by a preponderance of the evidence. *See id*.

Deciding a Rule 600 motion entails the following analysis. First, the court must determine the "'mechanical run date,' which is 365 days after the complaint was filed[.]" *Commonwealth v. Lear*, 325 A.3d 552, 557 (Pa. 2024). The court then accounts for and adds any excludable time to the mechanical run date "to produce the 'adjusted run date,' which is the deadline for the Commonwealth to bring the defendant to trial under Rule 600." *Id*.

If the trial did not commence before the adjusted run date, we then must determine whether the additional delay was excusable. For purposes of Rule 600, excusable delay is any delay that the Commonwealth did not cause and was not the result of the Commonwealth's lack of diligence. *Id*. at 560.

"When a defendant has not been brought to trial within the time periods set forth in [Rule 600(A),] at any time before trial, [he] may file a written motion requesting that the charges be dismissed with prejudice on the ground that [the] rule has been violated." Pa.R.Crim.P. 600(D)(1). "If the trial court determines that the Commonwealth violated Rule 600, it shall dismiss the charges and discharge the defendant." *Harth*, 252 A.3d at 615.

Haun challenges the trial court's denial of his Rule 600 motion to dismiss as an abuse of discretion. He argues that the Commonwealth failed to present evidence of its due diligence in obtaining a visiting judge and scheduling the case for trial. *See* Haun's Brief at 58. Haun claims that the Commonwealth failed to exercise due diligence during the periods of time "when the defense

filed motions or when judicial delay occurred."[9]  Haun's Brief at 63.  Haun

contends that the Commonwealth could not have been ready for trial in

September 2022, despite its assertion, because it filed a tender years' hearsay

motion in July 2022.  **See id**. at 65 n.2.  Haun asserts that "the

Commonwealth did nothing" but waited to request a trial date until: (1) the

court ruled on the tender years' hearsay motion; and (2) after both McKean

County judges recused themselves.  **Id**. at 67-68.  Haun claims that when a

defendant files a pretrial motion, the Commonwealth "must show that it acted

with due diligence in opposing or responding to the motion."  **Id**. at 68.  Haun

concludes that the trial court erred in ruling that the Commonwealth acted

with due diligence to bring the case to trial.

The trial court stated its reasons for denying the Rule 600 motion at the

Rule 600 hearing.  **See** N.T., 7/12/23, at 39-40.  The trial court concluded:

> [The following] dates from when [Haun] filed the Rule 600 motion[ on June 8, 2023,] until today, July 12[, 2023 including] all of the time . . . until August 1[, 2023] would be excusable because it's just the lack of the court availability during that period of time[,] not the district attorney's due diligence.
>
> When [the trial court] was contacted regarding the dates that were available, [the trial court] wasn't available at all in June or at all in July.  It's the dates that they gave [when the trial court] was not available because [the trial court has] other court obligations in other counties.  And [the trial court] was not

---

[9] Haun concedes that the following continuances were attributable to him: (1) for the preliminary hearing, from February 7, 2022 to March 7, 2022; and (2) for his last day to plea, May 12, 2022 to June 24, 2022.  **See** Haun's Brief at 63.

available on the dates they gave . . . in June. [The trial court] was not available on the dates that they gave . . . in July.

[Court administration informed the trial court that it needed at least three days for the trial if trial began on July 31st or August 1st. The trial court] said any of those work. They scheduled it as the 1st and the 2nd. That's the first the court was available. So all of the time is excusable and excludable. Commonwealth repeatedly filed the motions to schedule the trial. So they're not in violation of Rule 600.

[A]fter testimony and evidence was presented, [this] court hereby finds that the Commonwealth has acted with due diligence in scheduling this trial and has not violated Rule 600 as the dates to be excluded from the calculation of Rule 600 include the continuance by [Haun] of the preliminary hearing from . . . February 7[,] 2022, until it was ultimately held on March 7[,] 2022. Additionally, the time from the recusal of Judge Hauser, . . . on November 7th of 2022, until this court could hold a conference on January 19[], 2023[ is excluded. T]hen from the [January 19th] date of the conference an additional delay was caused by [Haun's request to file a] motion to sever [until] this court filed [its] opinion on [Haun's motion to sever on] April 12[], 2023, so all of those additional days are excluded.

[Haun] then also made a motion to continue the last day to plea on May 12th. It was continued to May 27th. Additional days were continued from May 27th to June 24th for the last day to plea. That time is also all excludable. Immediately thereafter, this trial was scheduled to commence on . . . August 1st and August 2[], 2023, as those were the first available dates that the court was available.

During this entire process, the Commonwealth filed motions to set a trial date. Therefore, the motion to dismiss under Rule 600 is hereby denied. Trial will commence on August 1[], 2023, as schedule[d] by the court.

N.T., 7/12/23, at 38-40 (unnecessary capitalization omitted).

Based upon our review of the record, we discern no abuse of discretion

by the trial court in finding that the Commonwealth acted with due diligence

with respect to each of the contested time periods. **See Faison**, 297 A.3d at 821.

Preliminarily, the mechanical run date — 365 days from the date of the filing of the complaint on January 21, 2022 — was Monday, January 23, 2023. **See Lear**, 325 A.3d at 557. Haun concedes that he delayed the proceedings by seeking continuances: (1) for the preliminary hearing, from February 7, 2022 to March 7, 2022; and (2) for his last day to plea, May 12, 2022 to June 24, 2022. **See** Haun's Brief at 63. Therefore, this total period of seventy-three days is excluded from Rule 600 calculations. **See Lear**, 325 A.3d at 560.

We agree with the trial court's conclusions as to the following. The delay caused by the recusals of Judge Pavlock and Judge Hauser constituted seventy-four days of excusable delay from November 7, 2022 to January 19, 2023. **See Crowley**, 466 A.2d 1009, 1011; **see also** Pa.R.Crim.P. 600. The delay from the date of the January 19, 2023 conference, caused by Haun's pre-trial motion to sever, until the trial court filed its opinion on April 12, 2023 constituted eighty-four days of excludable delay attributable to Haun. **See Hill**, 736 A.2d at 585; **see also** Pa.R.Crim.P. 600. The delay from June 8, 2023, when Haun filed the Rule 600 motion, to the hearing on the motion on July 12, 2023, constituted thirty-five days of excludable delay attributable to Haun. **See id**. The delay from the hearing on Haun's Rule 600 motion, on July 12, 2023, until August 1, 2023, the first date the court was available for

trial, constituted twenty-one days of excusable delay attributable to the court's unavailability.  **See Crowley**, 466 A.2d at 1011; **see also** Pa.R.Crim.P. 600.  The sum of the above periods is 287 days.  When we add this time to the mechanical run date, of January 23, 2023, we calculate the adjusted run date to be November 6, 2023.  **See Lear**, 325 A.3d at 557.  As trial commenced on August 1, 2023, before this date, we determine Haun's challenge is without merit.

As we conclude no relief is due on any of Haun's issues, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

5/20/2025